Garrett W. Wotkyns, Bar No. 025887
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
8068 East Del Acero Drive
Scottsdale, AZ 85258
Telephone: 480-889-3514
Facsimile: 212-233-6334
gwotkyns@scott-scott.com

*Co-Lead Counsel for the Class*

[Additional Counsel on Signature Page.]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Peter Frouws; Mehran Esfandiari; Stephen D. Marinelli,<br><br>Plaintiffs,<br><br>v.<br><br>Edgio Incorporated; Robert Lyons; Daniel Boncel; and Stephen Cumming,<br><br>Defendants. | No. CV-23-00691-PHX-DJH<br>No. CV-23-01170-PHX-SMM<br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

# TABLE OF CONTENTS

I. NATURE AND SUMMARY OF THE ACTION ........ 1
II. JURISDICTION AND VENUE ........ 4
III. THE PARTIES ........ 5
A. Lead Plaintiff ........ 5
B. Edgio ........ 5
C. The Individual Defendants ........ 5
IV. RELEVANT FACTS ........ 6
A. Background ........ 6
V. UNDISCLOSED FACTS REGARDING EDGIO'S GROWTH AND PERFORMANCE ........ 8
A. Throughout the Class Period, Edgio Was Materially Overstating Its Revenue and Lacked Effective ICFR ........ 8
B. Throughout the Class Period, Edgio Misrepresented Its Performance, Growth and Sales Pipeline and the Success of Its IEE Strategy ........ 12
VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ........ 21
A. Edgio's February 11, 2021 Form 8-K and FY 2020 Form 10-K ........ 22
B. Edgio's April 29, 2021 Form 8-K and Q1 2021 Form 10-Q ........ 24
C. Edgio's July 29, 2021 Form 8-K and Q2 2021 8-K and Form 10-Q ........ 25
D. Edgio's 2021 Strategy Session ........ 26
E. Edgio's November 4, 2021 Form 8-K and Earnings Call, and Q3 2021 Form 10-Q ........ 28
F. Edgio's January 20, 2022 Form 8-K and Earnings Call and FY 2021 Form 10-K ........ 32
G. Edgio's Q1 2022 8-K, Form 10-Q, and Earnings Call ........ 35
H. Edgio's August 8, 2022 Form 8-K and Earnings Call and Q2 2022 Form 10-Q ........ 38
I. Edgio's November 9, 2022 Form 8-K and Earnings Call and Q3 2022 Form 10-Q ........ 41
VII. THE TRUTH ABOUT EDGIO'S GROWTH AND PERFORMANCE GRADUALLY EMERGES ........ 45
VIII. EDGIO'S GAAP VIOLATIONS AND INTERNAL CONTROL VIOLATIONS ........ 47
IX. ADDITIONAL SCIENTER ALLEGATIONS ........ 49
X. LOSS CAUSATION ........ 51
XI. APPLICABILITY OF THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE ........ 53
XII. NO SAFE HARBOR ........ 54
XIII. CLASS ACTION ALLEGATIONS ........ 55
XIV. CAUSES OF ACTION ........ 57

XV. PRAYER FOR RELIEF .......... 58
XVI. JURY TRIAL .......... 58

Court-appointed Lead Plaintiff Peter Frouws ("Frouws" or "Lead Plaintiff"), by and through his undersigned counsel, brings this action under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of himself and a class of other similarly situated investors against Defendants Edgio, Inc.[1] ("Edgio" or the "Company"), Robert A. Lyons ("Lyons"), Daniel R. Boncel ("Boncel"), and Stephen Cumming ("Cumming") (collectively, the "Individual Defendants," and together with Edgio, "Defendants"). Lead Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the ongoing investigation of his undersigned counsel, which includes review of Defendants' press releases, conference call transcripts, filings with the United States Securities and Exchange Commission ("SEC"), and other public statements; news stories, analyst reports, and other public information concerning Edgio and the industry within which it operates; and interviews with former Edgio employees and/or others familiar with the Company.

## I. NATURE AND SUMMARY OF THE ACTION

1. This is a securities class action brought on behalf of all persons and entities, other than Defendants and their affiliated persons, who purchased or otherwise acquired shares of Edgio common stock between February 11, 2021 and March 12, 2023, inclusive (the "Class Period"). Lead Plaintiff brings claims against Edgio and certain of its current and former officers and directors. These claims arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

2. Edgio was founded in 2001 as a provider of content delivery network ("CDN") services used to deliver digital content over the internet.

3. Prior to the Class Period, Edgio's business was predominantly focused on selling CDN-related services to companies such as Amazon Prime, Disney+, HBO and

[1] Formerly known as Limelight Networks, Inc. ("Limelight"), on June 16, 2022, Limelight was renamed "Edgio, Inc." For ease of reference, the Amended Complaint generally refers to the Company as Edgio, notwithstanding that it was called Limelight prior to 2022.

NBC Peacock that deliver streamed content via internet-connected devices. By the second half of 2020, however, Edgio's revenues and profitability were declining, and on January 20, 2021, Defendant Lyons was named Edgio's new President and CEO. A few days later, on the Company's Q4 2020 earnings call, Lyons blamed Edgio's declining fortunes on a combination of normal price compression in the CDN industry and poor performance and unveiled a three-prong strategy called "Improve-Expand-Extend" (the "IEE Strategy" or "Strategy") to return the Company to growth and improve its profitability called "Improve-Expand-Extend. The IEE Strategy was designed to (i) restore lost revenue in the CDN business by improving the performance issues that had caused customers to leave or direct traffic to other providers as well as improve profitability by cutting unnecessary costs; (ii) expand Edgio's core CDN business by strengthening and broadening its key client relationships; and (iii) extend Edgio's business beyond digital content and files to include products that leveraged its large, underutilized global network and could be sold to a larger, more diverse customer base to drive high margin growth. Because Defendants viewed the total addressable market for edge solutions to be much larger than that of the CDN market, the goal of the Strategy was to transform Edgio from a video-focused, usage-based CDN focused on a small number of customers to a leading provider of high-margin, edge-enabled solutions attractive to a wide variety of customers.

4. Integral to this transformation was Edgio's acquisition of Moov Corporation, a California corporation doing business as Layer0 ("Layer0"), a sub-scale SaaS based application acceleration and developer support platform, in September 2021, and its later acquisition of Edgecast, Inc. ("Edgecast"), a business unit of Yahoo, Inc. and a leading provider of edge security, content delivery and video services, in June 2022.

5. Throughout the Class Period, Defendants claimed that Edgio was successfully executing the IEE Strategy and, as a result, was poised for growth. In particular, with respect to the "extend" prong of the Strategy, Defendants touted (i) the acquisition of Layer0, which they described as "critical to [Edgio's] evolution from a network company to a performance software technology company;" (ii) the purportedly

successful launch of Layer0's supposed "best-in-class" Application Operations ("AppOps") solution; (iii) purported customer enthusiasm and rapid, "triple-digit" growth in the pipeline for the Layer0 product; and (iv) the "top" caliber of the Company's newly hired sales force and its purported success in building the pipeline. In view of the foregoing, Defendants told investors that the Company's sales pipeline was growing at the rate it needed to grow to achieve the IEE Strategy's long-term objectives of double-digit revenue growth, 60% gross margins, 15% adjusted EBITDA and sustained positive free cash flow.

6. In fact, however, these statements were materially false and misleading because (i) the Layer0 App Ops product was not gaining traction with customers as it was not compatible with customers' existing systems or the CDN and security solutions Edgio were already selling; (ii) interest in the product was so poor the Company's sales teams were unable to book a meeting with a prospective customer without offering an incentive such as free Apple AirPods, and when the Company stopped offering incentives for a time, meetings became impossible to schedule; (iii) the touted sales pipeline was inflated because it was filled with "opportunities" that were virtually certain not to translate into sales; (iv) Edgio's highly touted sales force purportedly filled with "top talent" was untrained and ineffective because most members did not understand the Layer0 and other products they were tasked with selling; and (v) the Company's touted acquisitions were not driving the promised levels of growth. In short, Edgio's attempted pivot from video-focused CDN to a leading provider of edge-enabled solutions was a complete non-starter.

7. In addition, unbeknownst to investors, throughout the Class Period, the Company's revenue was materially misstated. On March 13, 2023, Edgio announced that it would restate its previously issued financial statements for FY 2021 and 2020 as well as the Quarterly Reports for 2022 and 2021 because the Company had improperly recognized revenue related to the Company's Open Edge solutions in violation of Generally Accepted Accounting Principles ("GAAP"). As a result, Edgio's revenue was overstated by $6.204 million in FY 2020, $16.515 million in FY 2021, and $23.67 million in the nine months

ended September 30, 2022. In addition, Edgio announced that it expected to disclose material weaknesses in the design and operation of its internal controls over financial reporting ("ICFR"), including the accounting for the Open Edge solutions.

8. The truth concerning Edgio's performance and growth prospects came to light in a series of partial disclosures and was not fully revealed to investors until after the market closed on March 12, 2023 (the last day of the Class Period) when Edgio announced its intent to restate its financial statements. These disclosures steadily drove down Edgio's stock price from $4.68 at the beginning of the Class Period to $1.03 on March 13, 2020 – a staggering 78% decline.

9. By this action, Lead Plaintiff seeks to recover, for himself and the putative Class he seeks to represent, the massive losses that they suffered as a result of Defendants' fraudulent and deceptive conduct.

## II. JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

12. Venue is proper pursuant to 15 U.S.C. §78aa and 28 U.S.C. §1391(b) because, at all relevant times, the false and misleading statements and omissions giving rise to the claims at issue were issued from this District, including the Company's materially false and misleading press releases and SEC filings. Further, at all relevant times, Edgio's global headquarters and principal executive offices were located in this District.

13. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of national securities exchanges.

## III. THE PARTIES

### A. Lead Plaintiff

14. Frouws was appointed Lead Plaintiff on November 2, 2023. As set forth in his certification previously filed with this Court, Frouws purchased Edgio common stock during the Class Period and was damaged by Defendants' conduct as alleged herein.

### B. Edgio

15. Edgio is a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware. From the beginning of the Class Period up until October 1, 2022, Edgio's global headquarters and principal executive offices were located at 465 North Scottsdale Road, Suite 400, Scottsdale, Arizona 85257. Thereafter, Edgio moved its global headquarters and principal executive offices to 11811 North Tatum Blvd., Suite 3031, Phoenix, AZ, 85028. The Company, formerly known as Limelight Networks, Inc., was founded in 2003 and went public in June 2007 and traded on the Nasdaq Global Market under the ticker "LLNW." Following the Edgecast acquisition, Limelight rebranded itself as Edgio and now trades under the ticker "EGIO."

16. At the opening of business on October 20, 2023, the Company's shares listing was transferred to the Nasdaq Capital Market.

### C. The Individual Defendants

17. Lyons served as Edgio's President and Chief Executive officer ("CEO") and was a member of Edgio's Board of Directors throughout the entire Class Period. Lyons signed Edgio's materially false and misleading FY 2021 and 2020 Forms 10-K and made multiple materially false and misleading statements and omissions on earnings calls and in press releases issued by Edgio throughout the Class Period.

18. Boncel served as Edgio's Chief Financial Officer ("CFO") throughout the Class Period until August 20, 2022 when he was replaced in this role by Defendant Cumming. Thereafter, Boncel remained at Edgio as its principal accounting officer until December 31, 2022. Boncel signed Edgio's materially false and misleading FY 2021 and 2020 Forms 10-K and Forms 10-Q for the quarters ended March 31, 2022 and 2021, June

30, 2022 and 2021, and September 30, 2022 and 2021. He also made multiple materially false and misleading statements and omissions on earnings calls and in press releases issued by Edgio during the Class Period.

19. Cumming has served as Edgio's CFO from August 22, 2022 to the present. Cumming signed Edgio's materially false and misleading Form 10-Q for the quarter ended September 30, 2022. He also made multiple materially false and misleading statements and omissions on earnings calls and in press releases issued by Edgio during the Class Period.

20. By virtue of their positions, the Individual Defendants named in ¶¶17-19 above possessed the power and authority to control the contents of the Company's SEC filings, public statements, and presentations to securities analysts, investors, and other market participants. Each Individual Defendant was provided with copies of the Company's public filings and statements alleged herein to be materially false and misleading prior to, or shortly after, their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of these Defendants knew that the material adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were materially false and misleading when made.

## IV. RELEVANT FACTS

### A. Background

21. Edgio operates one of the world's largest private networks designed to deliver websites, mobile applications, videos, music, software, games, and application programming interfaces ("APIs") quickly, reliably, and securely. In addition, Edgio offers real time streaming, edge and cloud security services, and cloud storage. As of December 31, 2020, Edgio reported having 527 active customers worldwide, including many notable brands in the fields of online video, live sports, digital music, news media, games, rich media applications, and software delivery.

22. On January 20, 2021, Edgio announced the hiring of Defendant Lyons as President, CEO, and a member of its Board of Directors. Less than a month later, Lyons acknowledged that the Company's "growth and profitability . . . [were] not where they need[ed] to be," and announced the IEE Strategy.

23. Edgio's July 2021 acquisition of Layer0, a "serverless platform" that "provide[d] development, deployment and monitoring tools that deliver[ed] sub-second web apps and APIs," was "a significant step in advancing [Edgio's] strategy as an edge enabled SaaS solutions provider," and a critical part of the Company's strategy to "extend" its core business.[2] Layer0 was expected to contribute "over $20 million of incremental revenue in 2022," allow for "approximately $3 million of additional annualized cost synergies," and "be accretive to adjusted EBITDA in 2022." According to Lyons, the acquisition of Layer0 and its "flagship" AppOps product would "enable [Edgio] to capitalize on the accelerating trend of developers utilizing the edge to better address application performance, overall productivity and reduce the attack surface," and "the combined Layer0 capabilities and [Edgio's] proprietary global network would give [Edgio] the best application delivery solution in the market." In addition, Defendant Boncel stated that "focusing on onboarding more software download customers and extending into the web application delivery space with the acquisition of Layer0, both of which generate significantly more offtake traffic," would improve Edgio's network utilization, and "[w]in-back opportunities in the software download area." According to Defendant Boncel, "[b]y offering this type of product solution, [Edgio] expect[ed] to diversify its customer base with more SaaS-oriented revenue versus [the Company's] traditional noncommitted usage base," and as Edgio grew "this product offering it [would] lead to customer growth, reduction in revenue concentration risk and a more predictable revenue stream."

[2] Limelight Networks, Inc., Current Report (Form 8-K) (July 28, 2021).

## V. UNDISCLOSED FACTS REGARDING EDGIO'S GROWTH AND PERFORMANCE

24. Throughout the Class Period, Defendants knew, or recklessly disregarded, but failed to disclose, numerous facts undermining the success of the IEE Strategy. As numerous Confidential Witnesses ("CWs") have confirmed, the acquisition of Layer0 and its AppOps product did not drive the growth necessary to achieve the long-term objectives of the IEE Strategy. Efforts to sell the product fell flat as Edgio's sales force struggled to secure meetings with prospective customers and ultimately failed to close a meaningful number of deals. The Edgecast acquisition also failed to provide expected momentum. In addition, as Defendants later admitted, the Company's revenues reported during the Class Period and touted by Defendants as evidence that the IEE Strategy was succeeding were materially misstated in violation of GAAP.

### A. Throughout the Class Period, Edgio Was Materially Overstating Its Revenue and Lacked Effective ICFR

25. Edgio's Open Edge solution is a "fully-managed managed . . . CDN service that embeds Edgio's content delivery platform directly into internet service provider ("ISP") clients' networks."[3] These transactions had a revenue sharing arrangement under which Edgio and ISP clients shared revenue from the traffic that ran through a point of presence ("PoP") using Edgio's content delivery platform.[4]

26. During FY 2021 and 2020, Edgio recorded revenue from these transactions when the PoP equipment was transferred to the ISP and expenses from the revenue share arrangement "were recorded over the term of the revenue sharing agreement, which [was] generally five years."[5] This practice resulted in revenue for FY 2021 and 2020 and the quarters ended March 31, 2022 and 2021, June 30, 2022 and 2021, and September 30, 2022 and 2021 being overstated in violation of GAAP. Because Edgio "continued to use the transferred equipment to satisfy [its] performance obligations to [its] clients and because

---

[3] Edgio, Inc., Current Report (Form 8-K, Ex. 99.1) (Mar. 13, 2023).

[4] *Id.*

[5] *Id.*

[the Company] obtain[ed] substantially all of the economic output of the equipment," the Open Edge arrangements were "financing leases" under ASC, 842-40-25-2[6] and, therefore, recognition of the sale of the equipment as revenue was precluded.[7]

27. On March 13, 2023, Edgio issued a press release admitting that its accounting treatment of the Open Edge arrangements was erroneous and had resulted in material misstatements of its financial statements for the years ended December 31, 2021 and 2020, as well as the Quarterly Reports for Q1-Q3 2022 and Q1-Q3 2021. Specifically, the release disclosed that:

> The Company and the Audit Committee identified an error in the Company's historic accounting treatment of Edgio's Open Edge Solution.
>
> * * *
>
> [T]he Company believes the sale of Open Edge equipment should be accounted for as financing leases, in which (1) the up-front payments received from the Company's customers associated with the transaction are recognized as a financing liability on the balance sheet, with the related equipment costs remaining in fixed assets and depreciated over time, and (2) pursuant to lease accounting, the revenue sharing payments made by Edgio to the customers allocated between cost of sales and lease payments, as an offset on the balance sheet against the lease liability.
>
> * * *
>
> The Company currently anticipates that the primary effects to correct this accounting may result in a reduction in revenues of up to approximately $6.6 million for the 12-month period ended December 31, 2020, up to approximately $16.7 million for the 12-month period ended December 31, 2021, and up to approximately $23 million for the nine-month period ended September 30, 2022, with a corresponding costs of sale reduction and impact to depreciation expenses and income taxes, as well as other adjustments. This represents a reduction of 5.8% on a consolidated pro-forma basis for the

---

[6] The Financial Accounting Standards Board's ("FASB") ASC – effective for interim and annual reporting periods ending after September 15, 2009 – is the single source of authoritative nongovernmental GAAP. Under U.S. GAAP, strict rules dictate when and how an entity is permitted to recognize revenue. Pursuant to SEC Regulation S-X, "financial statements . . . which are not prepare in accordance with [GAAP] will be presumed to be misleading or inaccurate, despite footnote or other disclosures . . . ." *See* 17 C.F.R. §210.4-01(a)(1).

[7] Edgio, Inc., Annual Report 2022 at 56 (Form 10-K) (June 29, 2023).

nine months ending September 30, 2022, and a reduction in previously reported revenue of 7.7% in 2021 and 2.9% in 2020.[8]

28. When Edgio's 2022 Form 10-K was finally filed on June 29, 2023, it revealed that Edgio's revenue had been overstated by $6.2 million in FY 2020, $16.5 million in FY 2021, and $23.7 million for the nine months ended September 30, 2022:

| Period | Overstated Revenue | Actual Revenue | Restatement Impact | |
|---|---|---|---|---|
| | | | In $ | In % |
| FY 2020 | $230,194,000 | $223,990,000 | $(6,204,000) | -2.7% |
| Q1 2021 | $51,195,000 | $49,658,000 | $(1,537,000) | -3% |
| Q2 2021 | $48,348,000 | $46,285,000 | $(2,063,000) | -4.3% |
| Q3 2021 | $55,202,000 | $47,994,000 | $(7,208,000) | -13.1% |
| FY 2021 | $217,630,000 | $201,115,000 | $(16,515,000) | -7.6% |
| Q1 2022 | $57,959,000 | $55,339,000 | $(2,620,000) | -4.5% |
| Q2 2022 | $74,312,000 | $63,586,000 | $(10,726,000) [9] | -14.4% |
| Q3 2022 | $121,156,000 | $110,832,000 | $(10,324,000)[10] | -8.5% |

29. Moreover, since a company's revenue necessarily impacts its profits and losses, Edgio's gross profit was also overstated, and its net loss and basic and diluted net loss per share were understated in the relevant periods.

30. Defendants' misreporting of the Open Edge arrangements also resulted in material misstatements of Edgio's assets and liabilities. Because the Open Edge transactions should have been accounted for as financing leases (i) up-front payments received from Edgio's customers should have been recognized as financing liabilities on the Company's balance sheet, with the related equipment costs remaining in fixed assets

---

[8] *Supra* note 3.

[9] This amount results from (i) errors related to Open Edge arrangements (whereby previously recorded revenue is now classified as financing obligations) and (ii) "[t]he correction of other ***immaterial errors*** affecting, *inter alia*, revenue." Annual Report 2022 at 105, *supra* note 7. [Emphasis added.] Edgio did not specify which portion of this amount results from which error.

[10] *Id.*

and depreciated over time, and (ii) the revenue sharing payments made by Edgio to its customers should have been allocated between cost of sales and lease payment as an offset on the balance sheet against the lease liability.

31. In addition to the foregoing, as later admitted by Defendants and contrary to their statements throughout the Class Period, Edgio's ICFR relating to (i) non-routine and complex transactions, including the Open Edge arrangements, (ii) revenue accounting system controls and (iii) financial close reporting were "not effective because of material weaknesses."[11] Specifically, the 2022 Form 10-K disclosed the following:

> 1) Non-routine/complex transactions
>
> We identified deficiencies related to the design of controls to analyze, account for and disclose complex transactions included in certain contractual arrangements such as (i) the "Open Edge" agreements and (ii) the Transition Service Agreement entered into between the company and Yahoo, Inc. as part of the Edgecast acquisition during the second quarter of 2022 (both of which resulted in the restatement of our previously issued consolidated financial statements, as described in Note 3). We also identified deficiencies in the design of certain other controls related to the Edgecast acquisition, including those that related to the identification of proper inputs and assumptions used in valuation models and a lack of sufficiently precise review of opening balance sheet accounts. Specifically, given the complexity of these agreements, we determined there was a lack of sufficient technical accounting personnel involved with the review and evaluation of these contractual agreements and transactions to ensure they were accounted for in accordance with US GAAP and in order to prevent or detect material misstatements on a timely basis.
>
> 2) Revenue accounting system controls
>
> We identified deficiencies related to the design of application controls and information technology dependent manual controls related to certain revenue processes. There was inaccurate data aggregation and processing of revenue events within our storage revenue systems, a lack of controls to identify and resolve errors if and when they occur, and a lack of sufficient documentation over the review of underlying data and reports used in the revenue accounting process. In addition, the operation of controls related to the precision of

[11] *Supra* note 7 at 122.

> review of certain content delivery agreements entered into during 2022 was not sufficient.
>
> 3) Financial close and reporting processes
>
> We identified certain operating deficiencies related to the control activities related to segregation of duties controls over the preparation and review of journal entries. In addition, [We identified certain operating deficiencies over the performance of certain account reconciliations, which was impacted by the growth in the organization from the Edgecast acquisition, and [their] ongoing effort to expand the accounting team during 2022.[12]

### B. Throughout the Class Period, Edgio Misrepresented Its Performance, Growth and Sales Pipeline and the Success of Its IEE Strategy

32. Throughout the Class Period, Defendants stated that Edgio was successfully executing management's IEE Strategy and was transforming itself from a video-focused CDN to a provider of edge-enabled solutions.

33. According to Defendants, one of the "leading indicators" of this success was Edgio's sales pipeline, which Defendants described as "robust" and growing "rapidly" at rates it needed to grow to support the Company's projections and "driv[e] meaningful revenue expansion."[13] Defendants stated that Edgio's pipeline was driven by a positive market response to newly launched products acquired in the Layer0 and Edgecast transactions, as well as the productivity and quality of Edgio's newly hired salesforce.

34. According to the accounts of numerous CWs, however, during the Class Period, Edgio's pipeline was anything but robust and the Company's untrained sales force struggled to elicit interest in, let alone sales of, Edgio's Layer0 products. Numerous CWs indicated that the touted "pipeline" was filled with opportunities that would never be closed.

35. CW1 worked as an Account Executive within Edgio's Enterprise Division for over a year, from November 2021 until December 2022. During the majority of CW1's

---

12 *Id.* at 122-23.

13 Limelight Networks, Inc., Current Report (Form 8-K) (Nov. 4, 2021); Limelight Networks, Inc., Current Report (Form 8-K) (Jan. 1, 2022); Limelight Networks, Inc., Current Report (Form 8-K) (Apr. 28, 2022).

tenure, CW1 reported to Joe Krasko ("Krasko"), Edgio's Vice President of Sales, who joined the Company following its acquisition of Layer0. As an Account Executive, CW1 was responsible for selling edge computing solutions to enterprise clients. The Layer0 application that CW1 was trying to sell purportedly allowed users around the world to have faster load times of their websites. Although CW1 had trouble understanding Edgio's products, according to CW1, the faster load times were achieved through a layer of software and servers that Edgio maintained around the world that were geographically close to the end user. The technology allowed information to be "pre-loaded" so that the end user could access it quickly. However, in the year CW1 spent with the Company, CW1 closed only one deal.

36. Approximately six months after joining Edgio, CW1 stated that salespeople were instructed by Krasko to create new opportunities in Salesforce (the customer relationship management system used at the time) with companies they had never spoken with. CW1 explained that Edgio had a sales partnership with Verizon and was instructed to enter the names of companies that came through from that partnership as sales "opportunities" in Salesforce, even when no sales conversations had occurred. Because an "opportunity" in Salesforce represented a conversation that a salesperson was having with a prospect that could lead to business, CW1 stated that this instruction was unusual from a sales perspective and was called "pipeline stuffing" in the industry – *i.e.*, creating a false pipeline to create a false sense of potential business the Company would derive. According to CW1, there were conversations among salespeople at Edgio, including through Slack channels, expressing confusion over this instruction, and many opined that it was being done to make the Company look stronger for the Street and allow management to create a story that Edgio had a pipeline of business that did not exist. This instruction continued through CW1's exit from the Company in December 2022.

37. CW2 was a Senior Sales Development Representative ("SDR") at Edgio from April to December 2022. For most of CW2's tenure, CW2 reported to Debby Richman ("Richman"), Edgio's former VP, Global Demand Generation. CW2 explained

that SDRs were "the top of the funnel of sales deals" at Edgio and performed the "initial outreach" to prospective customers. As an SDR, CW2 would get in touch with potential customers and decision makers at these companies, attempt to draw interest in Edgio's products and schedule a meeting between the prospective customer and an account executive. When CW2, first joined Edgio, the Company was providing free AirPods to prospective customers to entice them to take meetings. If a prospective client agreed to a meeting it would be recorded in Salesforce as an "opportunity." If, after the initial meeting, the account executive determined there was an intention on the part of the prospective customer to buy Edgio products or services, the opportunity would be "qualified." According to CW2, account executives were able to qualify an opportunity without much managerial oversight. The quota per month for SDRs was ten qualified opportunities per month, and SDRs were paid about $300 per qualified opportunity, although this amount changed over time. CW2 believed that the number of qualified opportunities was inflated because many of the opportunities that were qualified had little chance of becoming sales.

38. According to CW2, CW2 and other SDRs did not have a grasp on what they were selling, and CW2 likened the Company's product meetings to teach SDRs about Edgio's products to "teaching a cat about space travel." CW2 recalled weekly SDR calls during which strategy was discussed, but very little discussion about digging into actual opportunities. Instead, SDRs were often scolded for a lack of performance, especially after the Company stopped giving away AirPods as an incentive. According to CW2, Richman was "facing a ton of pressure" and, as a result, the Company was constantly changing the techniques (*e.g.*, cold emailing, cold calling, LinkedIn messages) the SDRs were to utilize in an effort to schedule more meetings. Also, the Company would change the "ideal customer profile" ("ICP") that SDRs should pursue, switching from nothing under $500 million in revenues one week to mom-and-pop shops the next.

39. CW3 worked as a Senior Strategic Account Executive at Edgio from June 2021 to January 2022. Prior to joining Edgio, CW3 worked at Layer0 from November 2020 to June 2021. CW3 left the Company in January 2022 because "there was not enough

in the pipeline to support [CW3's] sales activity." CW3 believed this was a constant problem with the Layer0 business that pre-dated the Edgio acquisition.

40. CW4 joined Edgecast/Verizon Media as a Senior Director of Field Sales in April 2018 and became the Global Head of Channel Sales to manage the Verizon relationship just prior to Edgio's acquisition of Edgecast. Following the merger, CW4 remained in this position until June 2023. While at Edgio, CW4 reported to Eric Armstrong ("Armstrong"), Edgio's Chief Growth Officer. CW4 explained that the channel team worked with Verizon to sell CDN and web security products acquired in the Edgecast transaction through Verizon's product catalogue. These products were "white labeled" as Verizon products and called Web Acceleration and Web Security. Verizon had a specialized global security team focused on selling security products and Edgio's channel team embedded themselves with this team. Edgio employees on the channel side would help with pricing, proposals, providing informational slide decks, and presentations for customers as needed. After being alerted by Verizon to potential sales opportunities through an automated process, the Edgio channel team would enter the opportunity into Edgio's Salesforce platform. Following discussions with the customer, a channel representative would come up with a quote and send it to the Verizon specialist, who would add a mark-up and submit the quote to the prospective customer. This additional mark-up constituted the revenue that Verizon would take from the sale.

41. According to CW4, Edgio laid off a great deal of people following the acquisition of Edgecast, including many who were running sales operations. CW4 believed this loss of institutional knowledge was a detriment to the business and, subsequently, the pipeline. CW4 stated that although Edgio wanted to push the Layer0 product, it did not fit with the other CDN and web security products that were being sold by the channel team, and while employed at Edgio, CW4 was not aware of any significant Layer0 sales except one with a repeat customer. According to CW4, six months after the merger with Edgecast, Edgio leadership was focusing more and more on Layer0 at the cost of "everyone and everything else," but even with the increased focus, there was "no real pipeline" for the

Layer0 product. CW4 stated that Edgecast/Verizon Media "did a lot better" in terms of sales prior to the merger, and that following the merger, things ground to a halt because sales leadership was uninterested.

42. According to CW4, the pressure to sell Layer0 caused a big relationship problem with Verizon. Specifically, Edgio wanted the channel team to include Layer0 in sales to Verizon channel customers. However, this was not possible because Layer0 was not a product included in Verizon's catalogue. CW4 tried to explain to Edgio CTO Ajay Kapur, the founder and former CEO of Layer0, that it was not possible to sell Layer0 through the Verizon channel, but the channel team was instructed to add Layer0 as a "hidden product" when pricing deals, creating "a pipeline out of nowhere."

43. CW5 served as the Global Verizon Channel Manager at Edgio from June 2022 to June 2023, when he was laid off. Prior to joining Edgio, CW5 occupied a similar position at Edgecast from June 2021 to June 2022. While at Edgio, CW5 initially reported to CW4. Following CW4's departure, CW5 reported to Kelly Gibson, Director, Channels. CW5 worked as a channel partner with Verizon's sales team, training them to sell Edgio products, including CDN services, DNS, WAF, and DDoS protection along with Verizon's own product portfolio.[14]

44. CW5 stated that Edgio did not have "a good understanding of what Edgecast did." According to CW5, Edgio had legacy Limelight sales representatives trying to sell Edgecast's products without fully understanding them. CW5 further explained that Edgio struggled to make any sales through the Verizon channel, adding that during the 12 months CW5 was at the Company, there were only a couple of small deals completed through the Verizon channel and the Verizon channel sales team only hit its monthly quota once.

[14] "DNS," or "Domain Name System," converts human readable website names into machine readable IP addresses. "WAF," or "web application firewall," protects web applications from various online attacks and breaches. "DDos," or "distributed denial-of-service" is a malicious attack aimed at disrupting the normal traffic of the targeted server, service, or network by overwhelming the target or its surrounding infrastructure with a flood of internet traffic.

45. CW6 was a Solutions Delivery Engineer at Edgio from June 2019 to May 2023. In this role, CW6 reported to James Rulison, currently Director, Solutions Engineering at Edgio. Although an engineer, CW6's role was part of the Company's sales organization. According to CW6, Edgio's sales organization consisted of account executives who would execute the actual sales, solution engineers to provide product support and customizations, and a technical account manager for instances when extra help was needed on an account.

46. CW6 indicated that Edgio had a weak pipeline and poor sales. According to CW6, it was difficult to make good sales at Edgio, and the sales that were made were often not profitable. CW6 cited PayPal, a customer from the Edgecast side of the business, as an example of a deal that required so much custom configuration and the hiring of extra engineers to keep up with requests that it became common knowledge at the Company that Edgio ended up losing money on the deal. According to CW6, having PayPal as a customer was "a logo play" for Edgio because the Company had lost so many customers in the early days of the merger. In addition, a lot of what CW6's team worked on included "upselling" Layer0 as a new user interface to existing customers. However, according to CW6, Layer0 was not compatible with the edge products Edgio was selling and there were not a lot of Layer0 sales being made.

47. CW7 was an Enterprise Account Executive at Edgio from April 2022 to January 2023. CW7 reported to Jay Iparraguirre, then Director of Enterprise Sales – East who reported to Krasko. In this role, CW7 was tasked with identifying net new business opportunities with enterprise customers for the Layer0 product. CW7 explained that Layer0 enhanced website speed allowing users to experience faster load times when using a website. CW7 was part of an East Coast team with five or six account executives who were focused on targeting and bringing in new customers who had no previous association with Edgio. According to CW7, Layer0 was difficult to sell and finding new net opportunities for the Layer0 product was not going well during CW7's tenure with the Company. CW7 was the only person during this time to secure a net new logo, a small

company called Spangler Candy, a deal valued at $136,603 over three years, and Edgio had to pay $52,684.30 to buy out the company's existing contract with a competitor to get the business. Like other CWs, CW7 explained that to secure meetings with prospective targets, Edgio offered incentives, including free AirPods, software deals, bundle packages, and contract buyouts. CW7 estimated that more than half of opportunities other than those that came through the Verizon or Microsoft channels came from the AirPods incentive. However, CW7 indicated that even the promise of free merchandise was often not successful in securing meetings with prospective customers due to a lack of interest.

48. CW7 stated that account executives were threatened with being put in performance improvement plans (PIPs) and instructed by Krasko to embellish numbers in Salesforce or risk their jobs. According to CW7, there were instances when account executives would input channel opportunities into the pipeline without having a conversation directly with the end-client.

49. CW7 confirmed that Edgio lost the Discovery streaming service as a client around the summer of 2022.

50. CW8 was a Director, Enterprise Sales – Central Region from May 2022 until December 2022 when he was laid off. CW8 was one of three Directors for Enterprise sales at Edgio reporting to Krasko. Krasko reported to Armstrong. CW8 eventually hired four salespeople onto the team but noted that Edgio lacked a good sales training program and most employees did not understand the technical aspects of the products they were selling. This lack of training contributed to difficulties in making sales.

51. CW8 was tasked with selling the Layer0 software platform, but despite a heavy push to get the product in front of customers, CW8's team was "getting very few customer meetings." CW8 stated that this problem was not specific to the Layer0 product and that "everyone in the entire Company [was] struggling to physically get in front of customers." CW8 stated that the Central Region sold just three net new accounts during CW8's six months with the Company. According to CW8 the sales organization was under pressure to put sales opportunities into Salesforce. This pressure came in the form of

threats, such as if the sales funnel was not at a certain value by a certain time, people would be put on performance improvement plans and eventually lose their jobs. As a result, "everything went into Salesforce" causing numbers to be "inflated." CW8 confirmed that Verizon, one of Edgio's channel partners, provided the Company a list of customers that might potentially be interested in Edgio products and that these customers would all be entered into Salesforce as opportunities by some account executives. CW8 characterized Salesforce as the "Holy Bible" of any sales team and stated that Directors and Vice Presidents within the sales organization would look at the system. In addition, CW8 believed the C-suite "100%" looked at the data from Salesforce.

52. CW9 was a Regional Account Executive from February 2022 to November 2022. Up until the summer of 2022, CW9 reported to the Director of Sales. Thereafter, Edgio divided its sales team into regions, *i.e.*, West Coast, Central, and East Coast, and CW9 reported to the West Coast Director of Sales who reported to Krasko. Each regional division was comprised of between four to six Account Executives. In this role, CW9 was tasked with selling to all prospective clients, regardless of size.

53. CW9 stated that most of the new business Edgio had coming in came from existing accounts with very little coming from new customers. There were few new customers. According to CW9, there were months when no account executive closed a significant deal across the entire team. Like CW3 and CW6, CW9 stated that Layer0 was extremely difficult to sell. CW9 explained that selling Layer0 was not just selling a single service. It required significant workflow changes which the customer had to take on in order to implement Layer0 and the actual physical network itself. According to CW9, although Layer0 was billed as a silver bullet, a customer's internal development team would have to change everything, including code and other applications they were running in order to have Layer0. CW9 raised the challenges of selling the products during the sales team's weekly calls each Monday to review the sales pipeline.

54. CW9 explained that Edgio had a "handful" of SDRs who set up meetings for account executives to bring in new opportunities and confirmed that incentives like gift

cards and Apple products were offered a majority of the time to book meetings. According to CW9, most of the time, prospective customers only took meetings because Edgio incentivized them with an Apple product or gift card. Edgio provided no formal training to CW9. No specific Layer0 training was provided. CW9 stated that SDRs did not seem to understand Edgio's products.

55. CW10 was a Lead Business Development Representative at Edgio from February 2022 to August 2022 and thereafter, the Lead Sales Enablement and Sales Operations Representative until April 2023. Initially, CW10 reported to Jacob Loechler. Upon his departure from the Company in September 2022, CW10 reported to Richman until she left the Company. According to CW10, the SDR team was tasked with bringing in meetings with sales leads for Edgio account executives. CW10 explained that SDRs would bring in meetings on all of Edgio's products, regardless of the product type or size of the prospective customers business. SDRs fell under demand generation while account executives reported under sales and VP Krasko.

56. According to CW10, in order to entice prospective customers into meetings, Edgio began offering free AirPods or $100 Amazon gift cards around March 2022. CW10 stated that every meeting came from these incentive offers and once the Company stopped the incentives, meetings "went away." According to CW10, there was no way to get prospective customers to meet with Edgio without an incentive, and eventually they were brought back in December 2022. CW10 noted that few of these meetings turned into actual sales. Indeed, CW10 booked 80 meetings in Q2 2022, but not a single one ended up being a sale.

57. According to CW10, the main product being sold during this period was Layer0. Edgio's efforts to push its security products were unsuccessful.

58. CW10 never had a grasp on Edgio's products as they were "complicated" and required specific training to understand, which the SDRs never really had. According to CW10, Edgio would hire people and just throw them in. For example, upon being hired,

CW10 was immediately told to start calling prospective customers and set up meetings. This was always an issue for the sales team.

59. According to CW10, during the period from December 2022 until the end of CW10's tenure, most account executives were on "performance improvement plans" and account executive turnover was "insane." CW10 was "constantly" being assigned new account executives and none of those CW10 worked with closed a sale during CW10's tenure. At quarterly "all-hands" meetings attended by CW10, there were discussions about the Company not hitting its sales numbers.

60. Near the end of 2022, CW10 became responsible for providing weekly reports on "demand generation" from Edgio's CRM system. This included a list of inbound leads (*i.e.*, prospective clients who reached out to Edgio on their own), outbound leads (*i.e.*, meetings the SDRs went out to try and book) along with any meeting that was turned into a qualified opportunity). These reports were reviewed during team meetings with, *inter alia*, Richman, Lauren Bradley (currently Edgio's Global Campaign Manager), and Andrea Jordan (currently Edgio's Director, Digital Marketing and Design). During the time CW10 prepared these reports, there were "a couple inbounds a week which were rarely qualified," low outbounds, and qualified opportunities were "pretty much always zero." In late 2022 into 2023, CW10 heard directly from account executives that they had not made a sale in six months and were being threatened with layoffs.

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

61. Throughout the Class Period, Defendants made materially false and misleading statements about (i) the effectiveness of Edgio's ICFR; (ii) Edgio's revenue for FY 2021 and 2020 and the Quarterly Reports for 2022 and 2021; and (iii) the success of the IEE Strategy and the size, strength and/or purported growth of Edgio's sales pipeline. Defendants' actionably false and misleading Class Period statements are separately enumerated below.

### A. Edgio's February 11, 2021 Form 8-K and FY 2020 Form 10-K

62. After market close on February 11, 2021, Edgio issued a press release reporting the Company's FY 2020 results. The release was attached as an exhibit to the Form 8-K filed by Edgio with the SEC the same day. For FY 2020, Edgio reported "record" revenue of $230.2 million, "a 15% increase from $200.6 million in 2019." In addition, Edgio reported FY 2020 gross profit of $83.1 million, GAAP net loss of $19.27 million, and basic and diluted net loss per share of $(0.16) per share.

63. The following day (February 12, 2021), the Company filed its 10-K for the year ended December 31, 2020 containing the materially false and misleading financial statements described in §§V(A) and VIII herein, above. The Form 10-K was signed by, among others, Defendants Boncel and Lyons.

64. Attached to the FY 2020 Form 10-K were the Certifications of Defendants Lyons and Boncel as Principal Executive Officer and Principal Financial Officer, respectively, certifying that:

(i) They each had reviewed the document;

(ii) "Based on [their] knowledge, th[e] [FY 2020 Form 10-K did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] [FY 2020 Form 10-K]";

(iii) "Based on [their] knowledge, the financial statements, and other financial information included in th[e] [FY 2020 Form 10-K], fairly present[ed] in all material respects the financial condition, results of operations and cash flows of [Edgio] as of, and for, the periods presented in th[e] [FY 2020 Form 10-K]";

(iv) "[They were] responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and [ICFR] (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and ha[d]:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating

to the registrant, including its consolidated subsidiaries, [was] made known to [them] by others within those entities, particularly during the period in which th[e] [FY 2020 Form 10-K] [was] being prepared;

(b) Designed such [ICFR], or caused such [ICFR] to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in th[e] [FY 2020 Form 10-K] [their] conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by th[e] report based on such evaluation; and

(d) Disclosed in th[e] [FY 2020 Form 10-K] any change in [Edgio's ICFR] that occurred during the most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that ha[d] materially affected, or [was] reasonably likely to materially affect, [Edgio's ICFR]."

65. Also attached to the FY 2020 Form 10-K were Defendant Lyons and Boncel's respective SOX Certifications, which certified that the FY 2020 Form 10-K "fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained [therein] fairly present[ed], in all material respects, the financial condition and results of operations of [Edgio]."

66. The foregoing statements in ¶¶62-65 were materially false and misleading, at the time they were made because as Defendants later admitted:

(i) Edgio did not maintain sufficient internal controls over the financial reporting process to ensure that the Company's financial statements were free of material errors and were reported in compliance with GAAP;

(ii) The material weaknesses in Edgio's internal controls over financial reporting included deficiencies related to the design of controls to analyze, account for, and disclose complex transactions included in certain contractual

arrangements, and a lack of sufficient technical accounting personnel to ensure they were accounted for in accordance with GAAP; and

(iii) Edgio's reported revenue and gross profit for FY 2020 were materially overstated and net loss and basic and diluted net loss per share were materially understated.

**B. Edgio's April 29, 2021 Form 8-K and Q1 2021 Form 10-Q**

67. After market close on April 29, 2021, Edgio issued a press release reporting its results for the period ended March 31, 2021, and issuing guidance for FY 2021. The release attached as an exhibit to the Form 8-K filed by Edgio with the SEC the same day. For Q1 2021, Edgio reported revenue of just $51.2 million, a 10% year-over-year decline from Q1 2020. In addition, Edgio reported Q1 2021 gross profit of $12.49 million, GAAP net loss of $25.5 million, and basic and diluted net loss per share of ($0.21) per share.

68. The following day (April 30, 2021), the Company filed its Form 10-Q for the quarter ended March 31, 2021, containing the materially false and misleading financial statements described in §§V(A) and VIII, above. The Form 10-Q was signed by Defendant Boncel.

69. Attached to the Q1 2021 Form 10-Q were the Certifications of Defendants Lyons and Boncel as Principal Executive Officer and Principal Financial Officer, respectively, making the same representations with respect to ICFR and the Q1 2021 Form 10-Q as identified in ¶64 above.

70. Also attached to the Q1 2021 Form 10-Q were Defendant Lyons and Boncel's respective SOX Certifications which certified that the Q1 2021 Form 10-Q "fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained [therein] fairly present[ed], in all material respects, the financial condition and results of operations of [Edgio]."

71. The foregoing statements in ¶¶67-70 were materially false and misleading because, at the time they were made:

(i) Edgio did not maintain sufficient internal controls over the financial reporting process to ensure that the Company's financial statements were free of material errors and were reported in compliance with GAAP;

(ii) The material weaknesses in Edgio's internal controls over financial reporting included deficiencies related to the design of controls to analyze, account for, and disclose complex transactions included in certain contractual arrangements, and a lack of sufficient technical accounting personnel to ensure they were accounted for in accordance with GAAP; and

(iii) Edgio's reported revenue and gross profit for Q1 2021 were materially overstated and net loss and basic and diluted net loss per share were materially understated.

**C. Edgio's July 29, 2021 Form 8-K and Q2 2021 8-K and Form 10-Q**

72. After market close on July 29, 2021, Edgio issued a press release reporting its financial results for Q2 2021 and touting those results as "delivering on several key milestones in its 2021 strategic plan . . . result[ing] in over $3 million of adjusted EBITDA improvements quarter over quarter." The release was attached as an exhibit to the Form 8-K filed by Edgio with the SEC the same day. For Q2 2021, the release reported revenue of $48.3 million, gross profit of $9.4 million, GAAP net loss of $13.7 million, and basic and diluted net loss per share of $(0.11).

73. The following day (July 30, 2021), the Company filed its Form 10-Q for the quarter ended June 30, 2021, containing the materially false and misleading financial results described in §§V(A) and VIII herein. The Form 10-Q was signed by Defendant Boncel.

74. Attached to the Q2 2021 Form 10-Q were the Certifications of Defendants Lyons and Boncel as Principal Executive Officer and Principal Financial Officer, respectively, making the same representations with respect to ICFR and the Q2 2021 Form 10-Q as identified in ¶64 above.

75. Also attached to the Q2 2021 Form 10-Q were Defendant Lyons and Boncel's respective SOX Certifications which certified that the Q2 2021 Form 10-Q "fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained [therein] fairly present[ed], in all material respects, the financial condition and results of operations of [Edgio]."

76. The foregoing statements in ¶¶72-75 were materially false and misleading, at the time they were made because:

(i) Edgio did not maintain sufficient internal controls over the financial reporting process to ensure that the Company's financial statements were free of material errors and were reported in compliance with GAAP;

(ii) The material weaknesses in Edgio's internal controls over financial reporting included deficiencies related to the design of controls to analyze, account for, and disclose complex transactions included in certain contractual arrangements, and a lack of sufficient technical accounting personnel to ensure they were accounted for in accordance with GAAP; and

(iii) Edgio's reported revenue and gross profit for Q2 2021 were materially overstated and net loss and basic and diluted net loss per share were materially understated.

**D. Edgio's 2021 Strategy Session**

77. On August 24, 2021, Edgio held its 2021 Strategy Session. During this session, Defendants expounded on the Company's IEE Strategy and how it would support growth and improved profitability. Lyons claimed that Edgio had already experienced a "150% growth in [its] pipeline in the last 6 months" excluding the Layer0 acquisition, which Defendant Boncel attributed to the "sales force replenishing th[e] pipeline." Boncel added that the sales force had been tasked with "doubl[ing] their pipeline by the end of the year."

78. In addition, Armstrong discussed Edgio's "go-to-market growth strategy" and how it would "impact[] new logo, new bookings and significantly improve[] annual

recurring revenue." Armstrong claimed that the Company had "a lot of upside opportunities," notably in (i) streaming, where Edgio planned on scaling its direct sales as well as reseller, OEMs and system integrator sales; (ii) the ISP market, where Edgio had a "very innovative partner strategy in place," *i.e.*, OpenEdge, which allowed ISPs to "purchase and deploy and extend [Edgio's] network by buying edge caching servers with [the Company's] proprietary software . . . "; and (iii) "application orchestration," *i.e.*, combining Layer0 with Edgio's network and edge capabilities into a best-in-class holistic solution, which increased Edgio's total addressable market "for the very first time . . . to hundreds of thousands of global enterprises." Armstrong further stated that "over the next 3 quarters, [Edgio was] going to triple the sales staff for application orchestration" and focus on "enterprise and mid-market companies" most of which had a "6-month sales cycle." According to Armstrong, by "rapidly expanding the sales force" and selling "all solutions . . . globally starting in Q4 [2021]," Edgio expected to grab the "low-hanging fruit for application orchestration" from its "existing hundreds of . . . customers that [were] deployed for content delivery" thereby growing "new logos in [application orchestration] by over 10% next year."

79. Later, in response to an analyst's question about the "ideal resume of all sales reps," Armstrong indicated that the "time to get up to speed on either solution with the training materials [was] not very long," that ideally candidates would have "existing relationships" in the media space, "some CDN experience" as well as an understanding of the "market, the competition, the alternatives." According to Armstrong, "media [was] easy" and "Layer0 [was] also not that difficult." Lyons added that the Company had "built out detailed plans of how [Edgio] was going to hire every month, every quarter" and "how [to] bring [salespeople up] to speed faster with better training, better content and try to get them up to speed in 3 to 4 months compared to what historically would have been 9 months."

80. The foregoing statements in ¶¶77-79 were materially false and misleading at the time they were made because, as described by numerous CWs:

(i) Edgio's sales pipeline was inflated with opportunities that had little chance of becoming sales;

(ii) Edgio's products were highly complex and the company provided little or no training to the newly hired SDRs and account executives tasked with selling them. Consequently, most SDRs and account executives did not understand Edgio's products, undermining sales efforts; and

(iii) The Layer0 product that was the primary focus of Edgio's sales efforts was garnering little or no interest from customers and was difficult to sell due to its incompatibility with customers' existing systems and lack of "fit" with other CDN and security products being sold by certain sales teams. As a result, there was no real pipeline for the Layer0 product.

### E. Edgio's November 4, 2021 Form 8-K and Earnings Call, and Q3 2021 Form 10-Q

81. After market close on November 4, 2021, Edgio issued a press release reporting "significant revenue, gross margin and adjusted EBITDA growth quarter over quarter for Q3 2021." The release was attached as an exhibit to the Form 8-K filed by Edgio with the SEC the same day. Specifically, Edgio reported revenue of $55.2 million, up 14% quarter over quarter, and an Adjusted EBITDA margin of 11%, up from breakeven in Q2 2021. According to the release, Edgio "[c]losed more than 30 customer opportunities" during the quarter, "more than 10 of which ha[d] an Annual Contract Value (ACV) of greater than $100,000 and 2 of which ha[d] and ACV of greater than $1 [million]." The release also reported "[s]trong pipeline growth with new logo bookings up more than 3x quarter over quarter." The release also touted (i) the completion of the Layer0 acquisition and successful launch of its "best-in-class AppOps solution;" (ii) "[d]iverse new client wins includ[ing] a large mattress retailer, a global travel industry leader, and a $6B retail giant and the renewal of the top ranked US Bank;" and (iii) the "[p]lanned fourth quarter launch of [the Company's] App CDN offering and then proprietary security offerings." Notwithstanding this positive news, the release reported reduced guidance for

revenue ($215 to $220 million), GAAP Basic EPS ($0.47) to ($0.42), non-GAAP EPS ($12 to $15 million), and Adjusted EBITDA ($15 to $20 million).

82. That same day (November 4, 2021), Defendants Lyons and Boncel conducted a call with securities analysts to discuss Edgio's Q2 2021 results. During the call, Defendant Lyons stated that Edgio "saw strong pipeline growth in the quarter" and that the Company's "focus on new logos [was] paying off with new logo bookings up more than 3x quarter-over-quarter."

83. Lyons also announced the closing of the Layer0 acquisition, which he described as "critical to [Edgio's] evolution from a network company to a performance software technology company." Lyons indicated that Edgio would be "announcing and launching new security and developer solutions in November and December" that when "enabled with [the Company's] world-class-edge network position[ed] [it] to be a compelling competitor in the multibillion dollar App Ops market." Lyons concluded his prepared remarks stating that "[t]he pipeline [was] growing and [Edgio was] adding resources to accelerate momentum." Later, in response to an analyst's question about the new solutions being launched in November and December, Lyons agreed that since these were upgrades of what the Company was already doing with existing customers, Defendants were "expecting the upsell . . . to be fairly quick[] in terms of its success, adding that "the leading indicators that [the Company was] seeing with client conversations [and] pipeline growth all supports that thesis."

84. Commenting on the reduction in FY 2021 guidance, Defendant Boncel stated the decision was "[b]ased on forecast[s] from [the Company's] larger clients and their view of their content and COVID traffic patterns," which led Defendants to conclude that "$60 million to $65 million represent[ed] the most likely fourth quarter revenue for [Edgio]." Boncel commented that this still "represent[ed] a record revenue quarter for [Edgio] with a return to organic year-over-year growth." Boncel stated that the Company was "accelerating investments in rebuilding [its] sales team" because "existing products [were] seeing traction and new products [were] to be launched over the next few months."

85. In response to an analyst's question concerning when Edgio would start to see some traction from the turnaround in its sales force, Defendant Lyons responded that "with the augment of Layer0 as well as some of the other things like EdgeXtend that [the Company had] launched, [Edgio] ha[d] a really nice portfolio of things to sell, and [had] been hiring accordingly." Lyons stated that the Company had been "averaging . . . over Q3, about a hire a week for quota-carrying sales reps" because Edgio was "having so much good success . . . we . . . accelerate[d] that a little bit in this quarter, so that we can get the full year run rate of that capacity next year. So we're having pretty good success there." When asked "[w]hy the success so quickly in terms of new pipe[line] in the quarter," Lyons stated that "Layer0 was actually growing pretty rapidly" and "what [Edgio was] able to do [was] take their product, which was very hot and desirable . . . and run with it." In addition, Lyons stated that Edgio had "done a lot of work in understanding exactly how to target the "outcome-based buyers" Edgio had previously identified as potential App Ops buyers and "build the pipeline and create leads and demand gen" and "[Edgio's] pipeline [was] growing pretty rapidly" and at the expected rate. Later, Lyons commented that Defendants "initially had a slower ramp of salespeople" in its plan "but . . . had the opportunity to get more quality salespeople" and "decided to take advantage."

86. During the call, Defendant Boncel stated that Edgio had "a really good sequential expansion in margins from Q2 to Q3 of over 700 basis points" and that Defendants "expect[ed] to see continued expansion" of "at least another couple of hundred basis points from Q3 to Q4." Defendant Boncel blamed the reduction in FY 2021 guidance on the slower rebound in traffic from two large customers following the Company's performance improvements.

87. The following day (November 5, 2021), Edgio filed its Form 10-Q for the quarter ended September 30, 2021, containing the materially false and misleading financial results described in §§V(A) and VIII herein. The Form 10-Q was signed by Defendant Boncel.

88. Attached to the Q3 2021 Form 10-Q were the Certification of Defendants Lyons and Boncel as Principal Executive Officer and Principal Financial Officer, respectively, making the same representations with respect to ICFR and the Q3 2021 Form 10-Q as identified in ¶64 above.

89. Also attached to the Q3 2021 Form 10-Q were Defendant Lyons and Boncel's respective SOX Certifications which certified that the Q3 2021 Form 10-Q "fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such . . . Form 10-Q fairly present[ed], in all material respects, the financial condition and results of operations of [Edgio]."

90. The foregoing statements in ¶¶81-89 were materially false and misleading at the time they were made because, as described by numerous CWs:

(i) Edgio did not maintain sufficient internal controls over the financial reporting process to ensure that the Company's financial statements were free of material errors and were reported in compliance with GAAP;

(ii) The material weaknesses in Edgio's internal controls over financial reporting included deficiencies related to the design of controls to analyze, account for, and disclose complex transactions included in certain contractual arrangements, and a lack of sufficient technical accounting personnel to ensure they were accounted for in accordance with GAAP;

(iii) Edgio's reported revenue and gross profit for Q3 2021 were materially overstated and net loss and basic and diluted net loss per share were materially understated;

(iv) Edgio's sales pipeline was inflated with opportunities that had little chance of becoming sales;

(v) Edgio's products were highly complex and the Company provided little or no training to the newly hired SDRs and account executives tasked with selling them. Consequently, most SDRs and account executives did not understand Edgio's products, undermining sales efforts;

(vi) The Layer0 product that was the primary focus of Edgio's sales efforts was neither hot nor desirable. It was difficult to sell due to its incompatibility with customers' existing systems and lack of "fit" with other CDN and security products being sold by certain sales teams. As a result, there was no real pipeline for the Layer0 product; and

(vii) Edgio's reduced Q4 2021 guidance was not due to issues with its customers' content or COVID traffic patterns but rather was the result of poor sales of Layer0.

**F. Edgio's January 20, 2022 Form 8-K and Earnings Call and FY 2021 Form 10-K**

91. After market close on January 20, 2022, Edgio issued a press release reporting "significant" quarter-over-quarter growth in revenue, gross margin, and adjusted EBITDA for Q4 2021 and its results for FY 2021. The release was attached as an exhibit to the Form 8-K filed by Edgio with the SEC the same day. Specifically, the release reported (i) Q4 2021 revenue of $62.9 million, up 14% from Q3 2021 and compared to Q4 2020; (ii) an improvement in GAAP net loss per basic share over Q3 2021; (iii) non-GAAP net income of $2.4 million, an improvement of $3.9 million and $6.2 million over Q32021 and Q4 2020, respectively; (iv) adjusted EBITDA of $9.7 million, up 60% from Q32021 and Q4 2020; and (v) EBITDA of $0.5 million, an improvement of $2.5 million over Q32021's EBITDA of $(2.0) and the break-even EBITDA of Q4 2021. The release also provided the following guidance for FY 2022:

| | |
|---|---|
| Revenue | $240 to $250 million |
| GAAP Basis EPS | $(0.27) to $(0.22) |
| Non-GAAP Basis EPS | $(0.06) to $(0.01) |
| Adjusted EBITDA | $24 to $28 million |
| Capital Expenditures | $20 to $25 million |

92. The release attributed the Q4 2021 results to successful execution of Edgio's IEE strategy. Among other things, the release touted (i) "a 45% increase in total bookings quarter-over-quarter; (ii) the closing of many new opportunities in Q4 2021, with more than ten averaging greater than $100,000 in Annual Contract Value; and (iii) a new client win of a large consumer products company with more than 100 household brands. The release also touted the following as providing continued momentum for Q1 and FY 2022: (i) the expected completion of sales hiring goals by Q1 2022, a quarter ahead of plan; (ii) a growing pipeline for the Company's AppOps solutions; (iii) the launch of the Layer0 web application, Edgio's flagship product for the AppOps segment, and the GraphQL caching and serverless host functionality for Layer0; and (iv) the intended launch of Edgio's security offerings "in a few weeks."

93. That same day (January 20, 2022), Defendants Lyons and Boncel conducted a call with securities analysts to discuss these results. Defendant Lyons touted the "momentum of the business," and the growth and diversity in the Company's pipeline as "leading indicators" of this momentum. In addition, Lyons promised "a steady stream of new and improved product announcements," and touted "the caliber of new salespeople [Edgio had] been able to attract in the last few months," citing this "ability to attract top talent" as permitting the Company to "accelerate the expansion of [its] commercial growth capacity."

94. On February 17, 2022, the Company filed its Form 10-K for the year ended December 31, 2021 containing the materially false and misleading financial statements described in §§V(A) and VIII herein. The Form 10-K was signed by, among others, Defendants Boncel and Lyons.

95. Attached to the FY 2021 Form 10-K were the Certifications of Defendants Lyons and Boncel as Principal Executive Officer and Principal Financial Officer, respectively, making the same representations with respect to ICFR and the FY 2021 Form 10-K as identified in ¶64 above.

96. Also attached to the FY 2021 Form 10-K were Defendants Lyons and Boncel's respective SOX Certifications which certified that the FY 2021 Form 10-K "fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such . . . Form 10-K fairly present[ed], in all material respects, the financial condition and results of operations of [Edgio]."

97. The foregoing statements in ¶¶91-96 were materially false and misleading at the time they were made because, as described by numerous CWs:

(i) Edgio did not maintain sufficient internal controls over the financial reporting process to ensure that the Company's financial statements were free of material errors and were reported in compliance with GAAP;

(ii) The material weaknesses in Edgio's internal controls over financial reporting included deficiencies related to the design of controls to analyze, account for, and disclose complex transactions included in certain contractual arrangements, and a lack of sufficient technical accounting personnel to ensure they were accounted for in accordance with GAAP;

(iii) Edgio's reported revenue and gross profit for Q4 and FY 2021 were materially overstated and net loss and basic and diluted net loss per share were materially understated;

(iv) Edgio's business did not have momentum and its sales pipeline was inflated with opportunities that had little chance of becoming sales;

(v) Edgio's newly hired sales force was not accelerating the Company's growth. Edgio's products were highly complex and the Company provided little or no training to the newly hired SDRs and account executives tasked with selling them. Consequently, most SDRs and account executives did not understand Edgio's products, undermining sales efforts; and

(vi) The Layer0 product that was the primary focus of Edgio's sales efforts was not gaining traction with customers. It was difficult to sell due to its incompatibility with customers' existing systems and lack of "fit" with other

CDN and security products being sold by certain sales teams. As a result, there was no real pipeline for the Layer0 product.

**G. Edgio's Q1 2022 8-K, Form 10-Q, and Earnings Call**

98. Before market open on April 28, 2022, Edgio issued a press release reporting its financial results for Q1 2022. The release was attached as an exhibit to the Form 8-K filed by Edgio with the SEC the same day. For the second quarter in a row, the Company announced "significant" year-over-year growth in revenue, gross margin, and adjusted EBITDA. Specifically, Edgio announced:

(i) Revenue for the first quarter of $58.0 million, up 13% year over year.

(ii) A 630-basis point improvement in gross margin year-over-year; and

(iii) Adjusted EBITDA of $2 million versus a loss of $3.3 million in the prior year period.

99. The release also touted:

(i) Positive momentum in Edgio's AppOps solutions resulting in "[c]ustomer additions [that] were the highest they have been in the previous five quarters";

(ii) Growth of more than 30% in Edgio's pipeline from the beginning of the year, with the Layer0 pipeline growing by triple digits;

(iii) A "mostly completed . . . planned rebuild of [Edgio's] sales and marketing teams," which was expected "to drive momentum in the second half of the year; and

(iv) The launch of Layer0 Security Platform.

100. The press release also informed investors that given the anticipated closing of the Edgecast acquisition in the next 30-60 days, the Company was maintaining its previously provided FY 2022 guidance.

101. That same day (April 28, 2022), Defendants Lyons and Boncel conducted a call with securities analysts to discuss Q1 2022 results and expectations for the remainder of FY 2022, including the announced acquisition of Edgecast. In his prepared remarks,

Defendant Lyons highlighted the positive trend in client additions, which he stated reached "a five-quarter high" in Q1 2022, as well as the Company's "growing pipeline." According to Lyons, during the quarter, Edgio:

> [A]dded 24 new logos, 15 of which were in the Americas. Of those, 60% were sourced and closed by [the Company's] newly created channel team, who [were] largely focused on AppOps. Of the new product sales, 9 replaced direct competitors in [the] quarter. Our pipeline continues to grow as well. In the quarter, [Edgio] grew [its] pipeline by more than 30%, with the AppOps portion growing by triple digits. [Edgio] continue[d] to attract large media companies for content delivery, but with [its] AppOps solution, [it was] also relevant to a variety of company sizes and types that [were] looking for the best solution for their high stakes web applications.

102. Lyons further stated that with the planned rebuild of Edgio's sales and marketing teams now largely completed, "[t]he second quarter [would] be the first full quarter for most of [the Company's] quota-carrying reps, providing ample opportunity for continued momentum in the second half of the year." Later in the call, in response to an analyst's question concerning the reasons for the pipeline growth, Defendant Lyons cited the Company's unique, best-in-class AppOps platform, the rebuilt sales team, and the Company's "redesigned . . . demand gen capabilities," stating:

> We hired a new team around demand gen and marketing and put new programs and [redesigned] that motion from bottom up, and we're starting to see the early stages of that production as well. So, when you look at our pipeline growth, it's growing at rates that we needed to grow to support the growth rates that we've been talking about. We're seeing it grow very significantly in the areas where we want to see it grow, which is in AppOps and call it non-CDN, but we're also seeing it grow in CDN as well. And we're pretty happy with the diversity of the portfolio. It also includes both large- and medium-sized customers in different industries as well. I think the broadened security story has also helped really accelerate the pipeline.

103. In response to an analyst question concerning Defendants' confidence that the Company would grow at the rate necessary to meet guidance, Defendant Boncel also emphasized Edgio's sales force and pipeline stating:

> As we built out that sales force, that pipeline and the demand gen capabilities that we have in place, that triple-digit growth in pipeline gives us confidence that we will convert that. And the conversion time period on those types of deals is a little bit quicker than the historical or legacy CDN business, which you have to run through a trial process and get through the procurement piece versus the Layer0, which we believe is a best-in-class product that developers are really looking forward to working with as quickly as possible given the productivity and efficiency improvements that that product has. And so, I think just the shortening of the conversion time line into actual revenue gives us that confidence. And the fact that we've only had the sales force and demand gen team in place for a really short period of time. And to see that growth in the pipeline is something that's very exciting for us. . . .

104. Lyons added that:

> [Edgio] had a bookings target that [the Company] [had] to hit every month, every quarter. We track it every week actually throughout the year. And when you get the bookings, obviously, then you have to convert that into revenue with the implementation. And we're actually on plan of where we expected to be in bookings to support [projected growth]. And so, you'll see that in the first quarter, we had bookings, you'll see that translate into revenue in the next quarter.

105. The following day (April 29, 2022), Defendant Edgio filed its Form 10-Q for the quarter ended March 31, 2022, containing the materially false and misleading financial results described in §§V(A) and VIII herein, above.

106. Attached to the Q1 2022 Form 10-Q were the Certifications of Defendants Lyons and Boncel as Principal Executive Officer and Principal Financial Officer, respectively, making the same representations with respect to ICFR and the Q1 2022 Form 10-Q as identified in ¶64 above.

107. Also attached to the Q1 2022 Form 10-Q were Defendants Lyons and Boncel's respective SOX Certifications which certified that the Q1 2022 Form 10-Q "fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such . . . Form 10-Q fairly present[ed], in all material respects, the financial condition and results of operations of [Edgio]."

108. The foregoing statements in ¶¶98-107 were materially false and misleading at the time they were made because, as described by numerous CWs:

(i) Edgio did not maintain sufficient internal controls over the financial reporting process to ensure that the Company's financial statements were free of material errors and were reported in compliance with GAAP;

(ii) The material weaknesses in Edgio's internal controls over financial reporting included deficiencies related to the design of controls to analyze, account for, and disclose complex transactions included in certain contractual arrangements, and a lack of sufficient technical accounting personnel to ensure they were accounted for in accordance with GAAP;

(iii) Edgio's reported revenue and gross profit for Q1 2022 were materially overstated and net loss and basic and diluted net loss per share were materially understated;

(iv) Edgio's AppsOps solutions did not have positive momentum and its claimed "triple-digit" growth in its AppOpps pipeline was predicated on opportunities that had little chance of becoming sales. As a result, the pipeline was not growing at the rate necessary to support the future growth rates Defendants had touted to the market;

(v) Edgio's rebuilt sales and marketing teams were struggling to get in front of customers and had to resort to offering incentives such as free Apple AirPods in order to schedule meetings. Few such meetings resulted in sales; and

(vi) The Layer0 product that was the primary focus of Edgio's sales efforts was not gaining traction with customers. It was difficult to sell due to its incompatibility with customers' existing systems and lack of "fit" with other CDN and security products being sold by certain sales teams. As a result, there was no enthusiasm and no real pipeline for the Layer0 product.

### H. Edgio's August 8, 2022 Form 8-K and Earnings Call and Q2 2022 Form 10-Q

109. After market close on August 8, 2022, Edgio issued a press release "report[ing] strong financial results for the second quarter ended June 30,

2022[,] [c]ontinuing four consecutive quarters of improved profitability, expanding market share, and extending its product portfolio." The release was attached as an exhibit to the Form 8-K filed by Edgio with the SEC the same day. The release quoted Defendant Lyons as stating that Edgio's "solutions [we]re demonstrating proof of value, [and its] clients [we]re doing more with [the Company] as [it] innovate[d] [its] technology business and continue[d] to develop solutions to respond to dynamically evolving needs." Lyons further stated that "[s]econd quarter 2022 revenue was ahead of plan and a historical best as [the Company] continue[d] building on the momentum established late last year."

110. For Q2 2022, Edgio reported revenue of $74.3 million, up 54% year-over-year, the Company's third consecutive quarter of double-digit growth. According to the release, Edgecast, which was acquired in June, contributed $12.8 million of this amount, while the remainder resulted from core business growth and the addition of Layer0 revenue. Gross margin was 30%, up 1050 basis points year-over-year. The release also provided updated FY 2022 guidance to reflect the acquisition of Edgecast as follows:

| | August 2022 | April 2022 |
|---|---|---|
| Revenue | $380 to $390 million | $240 to $250 million |
| Adjusted EBITDA | $13 to $16 million | $24 to $28 million |
| Capital expenditures | Less than 10% of revenue | $20 to $25 million |

111. The release also provided an "initial outlook" for 2023 of (i) revenue of between $550 and $560 million; and (ii) adjusted EBITDA that exceeds $65 million. This represented "[a]n implied revenue expansion of 44% and adjusted EBITDA margin expansion from 4% in 2022 to 12% in 2023."

112. That same day (August 8, 2022), Defendants Lyons and Boncel conducted a call with securities analysts to discuss Edgio's Q2 2022 results. Specifically, Lyons stated that "[i]n the second quarter of 2022, [Edgio] continue[d] to build on 3 previous quarters of positive momentum" and was "well positioned for continued growth through [2022] and into [2023]." Lyons also stated that the Company's pipeline "continue[d] to grow, [and

was] already up 50% th[at] year and [was] heavily focused on [the Company's] high-margin, high-growth AppOps opportunities." Lyons clarified that the 50% metric did not include anything related to Edgecast and was an all-in number. According to Lyons, "the AppOps pipeline [was] actually up triple digits." As for "bookings," Lyons stated that Edgio "slightly beat [its] bookings against plan in the quarter and [was] ramping to do the same thing [in Q3 2022], [s]o [Edgio's] bookings [were] tracking where [the Company] expected to track."

113. In commenting on 2022 guidance, Defendant Boncel noted that the revenue and gross margin projections "captured" the departure of a large streaming customer prior to the closing of the Edgecast transaction and "assume[d] 45% of overall revenue [would] be from high-margin AppOps and streaming solutions," and that Edgio "expect[ed] gross margins and adjusted EBITDA to continually improve throughout [2022] and [2023] and [the Company] realized the benefit of planned synergies, increased utilization and diversified revenue mix." Boncel also stated that "[b]eyond 2023, [Edgio] continue[d] to have confidence in [its] ability to achieve [its] longer-term objective of double-digit revenue growth, 60% gross margins and 15% adjusted EBITDA and with sustained positive free cash flow."

114. After market close the following day (August 9, 2022), Edgio filed its Form10-Q for the quarter ended June 30, 2022, containing the materially false and misleading financial results described in §§V(A) and VIII herein, above.

115. Attached to the Q2 2022 Form 10-Q were the Certifications of Defendants Lyons and Boncel as Principal Executive Officer and Principal Financial Officer, respectively, making the same representations with respect to ICFR and the Q2 2022 Form 10-Q as identified in ¶64 above.

116. Also attached to the Q2 2022 Form 10-Q were Defendants Lyons and Boncel's respective SOX Certifications which certified that the form 10-Q "fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act

of 1934 and that information contained in such . . . Form 10-Q fairly present[ed], in all material respects, the financial condition and results of operations of [Edgio].”

117. The foregoing statements in ¶¶109-116 were materially false and misleading at the time they were made because, as described by numerous CWs:

(i) Edgio did not maintain sufficient internal controls over the financial reporting process to ensure that the Company’s financial statements were free of material errors and were reported in compliance with GAAP;

(ii) The material weaknesses in Edgio’s internal controls over financial reporting included deficiencies related to the design of controls to analyze, account for, and disclose complex transactions included in certain contractual arrangements, and a lack of sufficient technical accounting personnel to ensure they were accounted for in accordance with GAAP;

(iii) Edgio’s reported revenue and gross profit for Q2 2022 were materially overstated and net loss and basic and diluted net loss per share were materially understated;

(iv) Edgio was not well positioned for future growth due to the difficulties it was having selling its Layer0 product and the unexpected loss of Edgecast customers following the merger; and

(v) The claimed “triple-digit” growth in Edgio’s AppsOps pipeline was predicated on opportunities that had little chance of becoming sales. There was no enthusiasm and no real pipeline for the Layer0 product. As a result, the pipeline was not growing at the rate necessary to support Edgio’s long-term growth objectives.

### I. Edgio’s November 9, 2022 Form 8-K and Earnings Call and Q3 2022 Form 10-Q

118. After market close on November 9, 2022, Edgio issued a press release reporting the Company’s financial results for Q3 2022. The release was attached as an exhibit to the Form 8-K filed by Edgio with the SEC the same day. The release reported

(i) Q3 2022 revenue of $121.2 million, up 119% year-over-year; (ii) GAAP gross margin of 30.5%, up 180 basis point year-over-year and 40 basis points quarter-over-quarter; (iii) record applications bookings with momentum continuing into Q4 2022; and (iv) pipeline growth of 75% since the beginning of the year, with the AppOps pipeline growing much faster. According to the release, Q3 2022 "was the highest bookings quarter for Edgio's Application solutions, and [the Company] expect[ed] continued momentum into [Q4 2022]." In the release, Defendant Lyons (i) touted Edgio's "first-ever eight figure TCV [total contract value] win in Applications solutions," (ii) described the Company's pipeline as "growing" and as "includ[ing] major global brands that [understood] the demonstrative value in [Edgio's] solutions, with many in active proof of concept," and (iii) stated that Edgio "expect[ed] this momentum to continue into the fourth quarter, driven by [Edgio's] security solutions."

119. The release also provided updated guidance. Newly appointed CFO Stephen Cummings was quoted as stating that in light of the then-current macro environment and "some churn across a group of smaller [Edgecast] customers," Edgio "expect[ed] a more measured top line in Q4" of (i) revenue between $109 million and $114 million; and (ii) an adjusted EBITDA range of a loss of $8 million to a loss of $6 million, implying an adjusted EBITDA margin between -7.5% and -5.5%.

120. That same day (November 9, 2022), Edgio filed its Form10-Q for the quarter ended September 30, 2022, containing the materially false and misleading financial results described in §§V(A) and VIII herein.

121. Attached to the Q3 2022 Form 10-Q were the Certifications of Defendants Lyons and Cumming as Principal Executive Officer and Principal Financial Officer, respectively, making the same representations with respect to ICFR and the Q3 2022 Form 10-Q as identified in ¶64 above.

122. Also attached to the Q3 2022 Form 10-Q were Defendant Lyons and Cumming's respective SOX Certifications which certified that the Q3 2022 Form 10-Q "fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities

Exchange Act of 1934 and that information contained in such . . . Form 10-Q fairly present[ed], in all material respects, the financial condition and results of operations of [Edgio]."

123. Later that day (November 9, 2022), Defendants Lyons and Cumming conducted a call with securities analysts to discuss Edgio's Q3 2022 results. With respect to the Company's sales pipeline, Defendant Lyons stated that "[Edgio's] pipeline ha[d] grown high double digits from the beginning of the year, and even more robustly for [Edgio's] strategic, high-growth revenue applications solutions." According to Lyons, the "pipeline include[d] major global brands" and consisted of "opportunities . . . at various stages, many in active proof of concept." In addition, Lyons stated that "[b]ookings of [Edgio's] Applications solutions [in Q3] were [the Company's] highest to date," and that the Company was "on track to grow that number meaningfully in the fourth quarter, driven by [Edgio's] security solutions." Lyons further touted that an 8-figure contract win in the quarter and the fact that one of the world's largest fintech companies "chose Edgio due to its unique ability to seamlessly integrate scale enabled performance, security and programmability at the edge" "validat[ed] the efficacy of Edgio's strategy and its solutions." Lyons concluded his prepared remarks on the pipeline stating that "[g]iven [Edgio's] ongoing pipeline growth and bookings trajectory, [Edgio] remain[ed] confident in [its] ability to continue accelerating [its] commercial momentum going forward."

124. Later, in response to an analyst's question about whether the guidance reduction was related to sales execution, Defendant Lyons stated:

> [O]ur bookings in Q3 w[ere], I believe, 30% to 40% over Q2 and we plan to be another 30% over in Q4, general numbers. Our pipeline is up 75% from the beginning of the year. This is not including any of the Edgecast added pipeline, just organic growth pipeline. Of that, the majority is focused on security and applications, which is up triple digits of that 75%.
>
> So we're actually seeing the traction on sales and bookings that we expected to see. We've got a number of large deals in proof of concept in the pipeline. I think deals are probably taking a little longer now. . . . But, generally,we're tracking with bookings and sales that we expected . . . .

125. Defendant Cumming reiterated that "[Edgio's] pipeline continue[d] to be very strong, driving momentum into the fourth quarter." In addition, with respect to Edgio's guidance, Cumming stated that:

> The fundamentals of our business are strong. We remain bullish on Edgio's transformation story and in our ability to drive long-term value creation for our shareholders. Having said that, the current macro environment has made us more cautious in the near term. We anticipate companies will delay or defer capital spending in the fourth quarter [which] could impact our ISP deployment, which depend on capital investments from our clients.
>
> Additionally, while we are progressing well on the integration of our Edgecast acquisition, we've seen some churn across a group of smaller customers. This is not unusual during acquisition of this magnitude. We see both of these as temporal in nature and have already taken steps to address them over the next few quarters. With this backdrop, we expect a more measured top line in Q4.

126. Cumming later specified that the churn was "purely a sort of mid-market and long tail within . . . Edgecast accounts." Lyons also stated that the "churn" impacted "300 accounts that [went] down a little bit, and [together] add[ed] up to a bigger number."

127. The foregoing statements in ¶¶118-126 were materially false and misleading at the time they were made because, as described by numerous CWs:

(i) Edgio did not maintain sufficient internal controls over the financial reporting process to ensure that the Company's financial statements were free of material errors and were reported in compliance with GAAP;

(ii) The material weaknesses in Edgio's internal controls over financial reporting included deficiencies related to the design of controls to analyze, account for, and disclose complex transactions included in certain contractual arrangements, and a lack of sufficient technical accounting personnel to ensure they were accounted for in accordance with GAAP;

(iii) Edgio's reported revenue and gross profit for Q3 2022 were materially overstated and net loss and basic and diluted net loss per share were materially understated;

(iv) The fundamentals of Edgio's business were not strong and its IEE Strategy had not positioned the Company for high margin growth. Edgio was not seeing traction on sales and bookings and did not have momentum to grow meaningfully in Q4 2022 due to the difficulties it was having selling the Layer0 AppOps product and the unexpected loss of Edgecast customers following the merger;

(v) The AppsOps pipeline was not "strong" and was not growing as it was predicated on opportunities that had little chance of becoming sales. There was no enthusiasm and no real pipeline for the Layer0 product; and

(vi) Edgio's reduced guidance was not due to the macro environment but rather was the result of Edgio's inability to grow sales of the Layer0 AppOps solutions at the rate necessary to support the Company's growth objectives and the loss of customers and traffic following the Edgecast merger.

## VII. THE TRUTH ABOUT EDGIO'S GROWTH AND PERFORMANCE GRADUALLY EMERGES

128. The truth concerning Edgio's growth, performance and prospects emerged gradually through a series of partial disclosures.

129. Before market open on April 28, 2022, Edgio issued a press release reporting its financial results for the quarter ended March 31, 2022. Although the Company reported Q1 2022 results ahead of expectations, at least one analyst, Rudy Kessinger of D.A. Davidson & Co. ("Davidson"), observed that despite the company's "talk about pipeline build . . . the last several quarters . . ., it has seemingly yet to materialize much, with organic growth still just +6% [year-over-year] in Q1." However, Kessinger also noted that "Q2 [would] be the first full quarter with a fully staffed sales team, which should yield more positive results." In response to this announcement, the price of Edgio's common stock plummeted from the prior day's close of $4.51 to $3.38 at market close, a decline of $1.13 or 25.1%.

130. After the market close on November 9, 2022, Edgio issued reduced guidance for Q4 2022 which also reset expectations for 2023. Specifically, the guidance for Q4 2022 revenue was $109 million to $114 million and adjusted EBITDA was projected to be between -$6 million and -$8 million. This meant that the Company effectively projected lower FY 2022 revenue of approximately $362 to $367 million (compared to the previously disclosed range of $380 to $390 million) and lower FY 2022 adjusted EBITDA of approximately $6 to $9 million (compared to the previously disclosed range of $13 to $16 million). Further, the foregoing implied that 2023 revenue would be well below the preliminary guidance of $550 million to $560 million that had been previously provided by the Company. In response to these disclosures, the following day (November 10, 2022), the price of Edgio's common stock declined from the prior day's close of $2.16 to $1.39, a decline of $0.77 or 35.6%.

131. Finally, before the market opened on March 13, 2023, Edgio filed a Form 8-K and accompanying press release announcing that it would restate its previously issued financial statements for the years ended December 31, 2021 and 2020, as well as Quarterly Reports for 2022 and 2021 related to the revenue recognition of its Open Edge solutions. The Form 8-K also disclosed that (i) the Company anticipated that FY 2020 revenue would be reduced by approximately $6.6 million, FY 2021 revenue would be reduced by approximately $16.7 million, and 1Q to 3Q 2022 revenue would be reduced by approximately $23.0 million, and (ii) Defendants expected to disclose a material weakness in the design and operation of effective internal controls over the accounting for the Open Edge arrangements. Further, the Company reported preliminary Q4 2022 revenue of $107 million to $109 million, below consensus estimates and prior Q4 2022 guidance of $109 million to $114 million. In a report issued the same day, analyst Rudy Kessinger of Davidson observed that "[b]ased on Layer0, Edgecast [and] Open Edge revenue figures provided in filings, press releases, conference calls, [and] through conversations [with management], Davidson estimated that legacy [Edgio] revenue was approx[imately] +2% [year-over-year] for the first 9 [months] ending 9/30/2022 [and] approx[imately] -2%

[year-over-year] for full-year CY22." In addition, Kessinger stated that Davidson "believe[d] Layer0 [was] falling well short of the $20 [million] revenue target for CY22" and that "Edgecast [was] likely to be down 30% [year-over-year] organically in Q422 due to loss of Discovery earlier in [2021 and] the significant traffic share loss/churn experienced in Q3/Q421 post[-]merger with [Edgio]."

132. In response to these disclosures, the price of Edgio's common stock declined 15.5% from the prior trading day's close of $1.03 to $0.87 at market close.

## VIII. EDGIO'S GAAP VIOLATIONS AND INTERNAL CONTROL VIOLATIONS

133. As alleged above, during the Class Period, Edgio issued financial statements that were materially misstated and not presented in accordance with GAAP. The SEC requires publicly traded companies such as Edgio to present their financial statements in accordance with GAAP. GAAP are a set of criteria used to determine measurement, recognition, presentation, and disclosure of all material terms appearing in the financial statements. American Institute of Certified Public Accountants ("AICPA") Auditing Standards Board ("ASB"), Auditing Standards -- Clarified, Section ("AU-C") Glossary of Terms.

134. Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC, which are not presented in accordance with GAAP "will be presumed to be misleading, despite footnotes or other disclosures." Regulation S-X also requires that interim financial statements comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.01-01(a).

135. The responsibility for preparing financial statements in conformity with GAAP is the responsibility of corporate management. In addition, corporate management are responsible for the design, implementation, and maintenance of internal controls relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

136. As discussed herein, Edgio's FY 2021 and 2020 financial statements and its 2022 and 2021 Quarterly Reports violated GAAP by (i) overstating revenue; and (ii) failing to maintain sufficient internal controls over the financial reporting process to ensure the Company's financial statements were reported in compliance with GAAP.

137. Pursuant to ASC[15] 842-40-25-1 "Determining Whether the Transfer of the Asset Is a Sale," "an entity shall apply the . . . requirements in [ASC] Topic 606 on revenue from contracts with customers [*i.e.*, paragraphs 606-10-25-1 through 25-8 on the existence of a contract, and paragraph 606-10-25-30 on when an entity satisfies a performance obligation by transferring control of an asset] when determining whether the transfer of an asset shall be accounted for as a sale of the assets." Thus, in order for the Open Edge arrangements to be accounted for as sales, Edgio had to satisfy a performance obligation by transferring control of the Open Edge equipment to its customers pursuant to ASC 606-10-25-23. In addition, the buyer must also obtain control of the asset.

138. As Defendants later admitted in the FY 2022 Form 10-K, however, this did not occur. Instead, Edgio "continue[d] to use the transferred equipment to satisfy [its] performance obligations to [its] clients and . . . obtain[ed] substantially all of the economic output of the equipment." For these reasons, the transfer of Edgio's equipment to its customers in the Open Edge arrangements did not constitute a sale. In fact, Defendants also admitted that the transferred Open Edge equipment constituted "embedded leasebacks" which should have been accounted for as financing leases and, as a result, ASC 842-40-25-2 "preclude[d] the recognition of the sale as revenue."

139. In addition to the foregoing, during the Class Period, Defendants falsely represented that Edgio maintained internal controls over financial reporting to ensure the reliability of the Company's financial reporting. As Defendants later admitted, however, during the Class Period, there were undisclosed material weaknesses in Edgio's internal controls over financial reporting that remained unremediated as of December 31, 2022.

---

15 Financial Accounting Standards Board Account Standards Codification ("ASC").

For example, Edgio identified deficiencies related to the design of controls to analyze, account for, and disclose complex transactions included in certain contractual arrangements, including the Open Edge arrangements, and determined that there was a lack of sufficient technical accounting personnel involved with the review and evaluation of these contractual agreements to ensure they were accounted for in accordance with GAAP and in order to prevent or detect material misstatements on a timely basis

140. Defendants' knowing or reckless failure to maintain effective internal controls over Edgio's financial reporting artificially inflated the Company's reported revenue during the impacted periods as alleged herein.

141. In addition, notwithstanding their failure to maintain effective controls over financial reporting, the Individual Defendants falsely certified that (i) the Company's reports during the Class Period on its internal controls mandated by Section 302 of the Sarbanes-Oxley Act of 2002 did not contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made not misleading; (ii) based on their knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report; and (iii) the Individual Defendants (a) were responsible for establishing and maintaining internal controls, (b) had designed such internal controls to ensure that material information relating to Edgio was made known to them by others within the Company, particularly during the period in which the periodic reports were being prepared, (c) had evaluated the effectiveness of Edgio's internal controls as of a date within 90 days prior to the report, and (d) had presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

142. As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew

or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to investors, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

143. At all relevant times, the Individual Defendants were the most senior management of Edgio. The Individual Defendants, because of their positions in the Company, possessed the power and authority to control the contents of Edgio's filings with the SEC, press releases, and presentations to securities analysts, and the Company's disclosures to the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be materially false and misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. The Individual Defendants also personally made the materially false and misleading statements to the market as alleged herein.

144. The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Edgio and, therefore, controlled the information disseminated to investors in the Company's press release and SEC filings and during earnings calls with analysts.

145. During the Class Period, the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes alleged herein to conceal Edgio's true performance, growth prospects, financial statements, and financial condition. Such actions inflated Edgio's revenue and the Company's stock price. The Individual Defendants' scienter may be imputed to Edgio as the Individual Defendants were Edgio's most senior management and were acting within the scope of their employment.

146. As alleged herein, the Individual Defendants knowingly and/or recklessly materially misstated Edgio's revenues reported in the Company's FY 2021 and 2020 financial statements, and its 2022 and 2021 Quarterly Reports filed with the SEC. In

addition, Defendants filed false SOX Certifications with the SEC representing that they had designed and maintained effective internal controls over Edgio's financial reporting.

147. In addition, during the Class Period, the Individual Defendants closely monitored Edgio's revenue and sales pipeline and, therefore, knew or were deliberately reckless in not knowing that the statements regarding such matters detailed herein were materially false and misleading.

148. Moreover, Defendants' material misstatements and omissions alleged herein related to Edgio's core business operations, including the progress and success of its IEE Strategy, which was vital to the Company's prospects. As Edgio's most senior executives, the Individual Defendants are presumed to have knowledge of these matters.

## X. LOSS CAUSATION

149. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Lead Plaintiff and members of the Class. During the Class Period, Lead Plaintiff and Class members purchased Edgio common stock at artificially inflated prices caused by Defendants' misconduct as alleged herein. The price of the Company's common stock declined significantly when the facts and risks that were misrepresented and concealed by Defendants were disclosed and/or materialized and Defendants' material misrepresentations and omissions were revealed to the market, causing investors' losses.

150. Before the end of the Class Period on March 12, 2023, investors were unaware of the following material facts about Edgio, among others, that were known to Defendants throughout the Class Period:

(i) Edgio's ICFR were ineffective due to several material weaknesses;

(ii) Edgio's revenues for FY 2021 and 2020 and Quarterly Reports for 2022 and 2021 were materially misstated in violation of GAAP; and

(iii) Edgio's IEE Strategy was not succeeding, the sales pipeline was inflated, not "robust," the Company's sales force was inexperienced and untrained, and sales of the Company's products were poor.

151. Defendants' misrepresentations and omissions, as alleged herein, misrepresented and concealed the true adverse facts from the market during the Class Period, leading investors to wrongly believe that Edgio was poised for growth and successfully executing its IEE Strategy.

152. As alleged above, these material facts were partially revealed to investors for the first time on April 28, 2022, and fully revealed on March 13, 2023. For example:

a. On April 28, 2022, Edgio issued financial results for Q1 2022 that reflected organic growth of just 6% year-over-year, notwithstanding several quarters of positive statements about purported strong growth in the Company's sales pipeline;

b. On November 9, 2022, Edgio issued reduced guidance for Q4 2022, which implied that FY 2022 guidance would not be met and called into question whether previously issued preliminary guidance for FY 2023 was achievable; and

c. On March 13, 2023, Edgio disclosed that (i) its financial statements for FY 2021 and 2020 and Quarterly Reports for 2022 and 2021 were materially misstated; (ii) there were material weaknesses in the Company's ICFR; and (iii) FY 2022 growth was negative for the legacy Edgio business, Layer0 was falling well short of its $20 million revenue target for FY 2022, and Edgecast revenue was likely down 30% year-over-year due to the loss of Discovery as a customer and significant traffic loss/churn post the merger with Edgio.

153. These disclosures were the materialization of the previously concealed risks concealed by Defendants' material misstatements and omissions as alleged herein.

154. The market reacted swiftly and negatively to these disclosures as shown in ¶¶129-130, 132 above.

155. The timing and magnitude of the decline in the price of Edgio's common stock, following the corrective disclosures as alleged herein and referenced above, negates

any inference that the loss suffered by investors was caused by changed market conditions, macroeconomic or industry factors, or other facts unrelated to Defendants' fraudulent conduct. Defendants' false and misleading statements, as set forth above, proximately caused foreseeable losses to the members of the Class.

## XI. APPLICABILITY OF THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE

156. The market for Edgio common stock was open, well developed, and efficient at all relevant times. As a result of Defendants' materially false and misleading statements and material omissions, the Company's common stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased the Company's common stock, relying on the integrity of the market price of such securities and on publicly available market information relating to Edgio. Lead Plaintiff and Class members have been damaged thereby.

157. During the Class Period, the artificial inflation of the value of Edgio common stock was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Lead Plaintiff and other Class members. As alleged herein, during the Class Period, Defendants made, or caused to be made, a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's common stock to be artificially inflated at all relevant times. When the truth was disclosed, it drove down the value of the Company's common stock, causing Lead Plaintiff and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

158. At all relevant times, the market for Edgio common stock was efficient for the following reasons, among others:

a. Edgio stock met the requirements for listing, and it was listed and actively traded on the Nasdaq, a highly efficient and automated market;

b. As a regulated issuer, Edgio filed periodic public reports with the SEC and/or the Nasdaq;

c. Edgio regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Edgio was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, which reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

159. Based on the foregoing, during the Class Period, the market for Edgio common stock promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of Edgio stock. Under these circumstances, the market for Edgio common stock was efficient during the Class Period and, therefore, investors' purchases of Edgio common stock at artificially inflated market prices give rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.

160. In the alternative, Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## XII. NO SAFE HARBOR

161. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled herein, as the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent any of the statements alleged to be false

may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and were unaccompanied by meaningful cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

162. Alternatively, to the extent that the statutory safe harbor is found to apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for such statements because, at the time each such statements were made, the speaker had actual knowledge that it was materially false or misleading, and/or the statement was authorized or approved by an executive officer of Edgio who knew that the statements were materially false or misleading when made.

## XIII. CLASS ACTION ALLEGATIONS

163. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired shares of Edgio common stock during the Class Period and were damaged thereby. Excluded from the Class are Defendants, Edgio's current and former officers, directors, parents, and subsidiaries, at all relevant times, their immediate family members, legal representatives, heirs, successors, or assigns of any such excluded person, and any entity in which Defendants have or had a controlling interest.

164. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Edgio common stock was actively traded on the Nasdaq. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Stock owners and other members of the Class may be identified from records maintained by Edgio or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

165. Lead Plaintiff's claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as alleged herein.

166. Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation. Lead Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

167. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Common questions include:

a. whether Defendants violated the federal securities laws as alleged herein;

b. whether Defendants made public statements during the Class Period that were materially false, misleading, or incomplete or otherwise omitted material facts;

c. whether the Individual Defendants caused Edgio to issue false and misleading statements;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

e. whether the price of Edgio common stock during the Class Period was artificially inflated because of the Defendants' wrongful conduct as complained of herein; and

f. whether the members of the Class have sustained damages, and, if so, what is the proper measure of damages.

168. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for them

to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XIV. CAUSES OF ACTION

### COUNT I
### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

169. Lead Plaintiff repeats and realleges each allegation contained above as if fully set forth herein. This claim is asserted on behalf of all members of the Class against Edgio and the Individual Defendants.

170. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

171. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

a. employed devices, schemes and artifices to defraud;

b. made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Edgio common stock during the Class Period.

172. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Edgio common stock. Lead Plaintiff and the Class would not have purchased Edgio common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT II**
**For Violation of §20(a) of the 1934 Act**
**Against the Individual Defendants**

173. Lead Plaintiff repeats and realleges each allegation contained above as if fully set forth herein. This claim is asserted on behalf of all members of the Class against the Individual Defendants.

174. The Individual Defendants acted as controlling persons of Edgio within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, the Individual Defendants had the power and authority to cause Edgio to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

## XV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A. Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B. Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiff and the members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Such other further relief as the Court may deem just and proper.

## XVI. JURY TRIAL

Lead Plaintiff demands a trial by jury of all issues that may so be tried.

Dated this 26th day of January, 2024.

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
s/ *Deborah Clark-Weintraub*
Deborah Clark-Weintraub (*pro hac vice*)
Thomas L. Laughlin, IV (*pro hac vice* forthcoming)
Emilie B. Kokmanian (*pro hac vice*)

The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-233-6444
Facsimile: 212-233-6334
dweintraub@scott-scott.com
tlaughlin@scott-scott.com
ekokmanian@scott-scott.com

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
Garrett W. Wotkyns (AZ Bar No. 025887)
8068 East Del Acero Drive
Scottsdale, AZ 85258
Telephone: 480-889-3514
Facsimile: 212-233-6334
gwotkyns@scott-scott.com

THE SCHALL LAW FIRM
Brian J. Schall (*pro hac vice* forthcoming)
Brian R. England (AZ Bar No. 024888)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile: 310-388-0192
brian@schallfirm.com
BrianE@schallfirm.com instead

*Co-Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 26, 2024, I caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Executed on January 26, 2024, at New York, New York.

s/ *Deborah Clark-Weintraub*
Deborah Clark-Weintraub