Garrett W. Wotkyns, Bar No. 025887
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
8068 East Del Acero Drive
Scottsdale, AZ 85258
Telephone: 480-889-3514
Facsimile:  212-233-6334
gwotkyns@scott-scott.com

*Co-Lead Counsel for the Class*

[Additional Counsel on Signature Page.]

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Peter Frouws, Individually and on behalf of all others similarly situated, *et al*., | No. CV-23-00691-PHX-DJH<br>No. CV-23-01170-PHX-SMM |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT** |
| v. | |
| Edgio Inc., *et al.*, | |
| Defendants. | **Oral Argument Requested** |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

THE UNDISCLOSED, MATERIALLY ADVERSE FACTS CONCERNING

EDGIO'S PIPELINE, SALES, SALES FORCE, AND REVENUE ............................... 2

DEFENDANTS' FALSE AND MISLEADING STATEMENTS.................................... 5

ARGUMENT ........................................................................................................... 8

I.    APPLICABLE LEGAL STANDARD .................................................... 8

II.   THE AC ADEQUATELY ALLEGES FALSITY ...................................... 9

      A.    The AC Plausibly Alleges Falsity ................................................. 9

      B.    The PSLRA's Safe Harbor for Forward-Looking Statements Does

            Not Apply to Mixed Statements ................................................. 11

III.  PLAINTIFF ALLEGES A STRONG INFERENCE OF SCIENTER ................... 14

      A.    The CW Allegations Support a Strong Inference of Scienter ..................... 15

      B.    The Core Operations Doctrine Supports a Strong Inference of Scienter

            ............................................................................................ 18

      C.    Misstated Revenue and False SOX Certifications ............................... 19

IV.   PLAINTIFF ADEQUATELY ALLEGES LOSS CAUSATION .......................... 20

V.    LEAVE TO AMEND SHOULD BE GRANTED ................................................. 22

CONCLUSION ...................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

PAGE(S)

**CASES**

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
   827 F.3d 1229 (10th Cir. 2016) ................................................................................ 19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................................... 8

*Avila v. LifeLock, Inc.*,
   No. 15-CV-1398, 2016 WL 4157358 (D. Ariz. Aug. 3, 2016) ................................... 16

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009) ..................................................................... 10

*Bajjuri v. Raytheon Techs. Corp.*,
   641 F. Supp. 3d 735 (D. Ariz. 2022) ......................................................................... 16

*Barry v. Colony NorthStar, Inc.*,
   No. CV 18-2888, 2020 WL 13834796 (C.D. Cal. Feb. 20, 2020)............................. 14

*Batwin v. Occam Networks, Inc.*,
   No. CV 07-2750, 2008 WL 2676364 (C.D. Cal. July 1, 2008) ................................. 19

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................................... 8

*City of Birmingham Relief and Ret. Sys. v. Acadia Pharm., Inc.*,
   No. 3:21-cv-00762, 2022 WL 4491093 (N.D. Cal. Sept. 27, 2022).......................... 22

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................................................................... 20

*E. Ohman J:Or Fonder AB v. NVIDIA Corp.*,
   81 F.4th 918 (9th Cir. 2023) ...................................................................................... 17

*Eminence Capital, LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ................................................................................... 22

*ESG Cap. Partners, LP v. Stratos*,
   828 F.3d 1023 (9th Cir. 2016) ................................................................................... 15

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
   501 F. Supp. 3d 735 (N.D. Cal. 2020) ....................................................................... 21

ii

*Glazer Cap. Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ...................................................................... 19

*Grigsby v. BofI Holding, Inc.*,
   979 F.3d 1198 (9th Cir. 2020) ................................................................... 20

*Harris v. Ivax Corp.*,
   182 F.3d 799 (11th Cir. 1999) ................................................................... 12

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) .................................................................... 9, 15

*In re Bofl Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020) ..................................................................... 20

*In re Convergent Tech. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) ........................................................................ 9

*In re Countrywide Fin. Corp. Deriv. Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................ 16, 18

*In re Cylink Sec. Litig.*,
   178 F. Supp. 2d 1077 (N.D. Cal. 2001) ........................................................ 9

*In re Diamond Foods, Inc. Sec. Litig.*,
   No. C11-05386, 2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ................................. 19

*In re Extreme Networks, Inc. Sec. Litig.*,
   No. 15-CV-04883, 2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ............................. 16

*In re Green Dot Corp.*,
   No. CV 19-10701, 2024 WL 1356253 (C.D. Cal. Mar. 29, 2024) .............................. 14

*In re Honest Co. Sec. Litig.*,
   615 F. Supp. 3d 1149 (C.D. Cal. 2022), *reconsideration denied sub
   nom.*, 2022 WL 18584804 (C.D. Cal. Aug. 25, 2022)................................................. 14

*In re Impinj, Inc. Sec. Litig.*,
   414 F. Supp.3d 1327 (W.D. Wash. 2019)................................................................ 21

*In re Invision Techs., Inc. Sec. Litig.*,
   No. C04-03181, 2006 WL 538752 (N.D. Cal. Jan. 24, 2006).................................... 10

*In re Mattel, Inc. Sec. Litig.*,
   No. 2:19-CV-10860, 2021 WL 1259405 (C.D. Cal. Jan. 26, 2021)............................ 19

*In re Miller Energy Res. Sec. Litig.*,
No. 3:11-CV-386, 2014 WL 415730 (E.D. Tenn. Feb. 4, 2014)...................................... 9

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ....................................................................................... 21

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ............................................................................. *passim*

*In re WageWorks, Inc., Sec. Litig.*,
No. 18-CV-01523, 2020 WL 2896547 (N.D. Cal. June 1, 2020).............................. 20

*In re XL Fleet Corp. Sec. Litig.*,
No. 21 Civ. 2002, 2022 WL 493629 (S.D.N.Y. Feb. 17, 2022)................................ 18

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ............................................................................... 9, 12

*Leventhal v. Chegg, Inc.*,
No. 21-CV-09953, 2024 WL 924484 (N.D. Cal. Mar. 4, 2024) ............................... 22

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) (*en banc*) .................................................................. 22

*Magro v. Freeport-McMoran Inc.*,
No. CV-16-00186-PHX-DJH, 2018 WL 3725781 (D. Ariz. Aug. 3,
2018) ....................................................................................................................... 20

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
900 F.2d 576 (2d Cir. 1990) ...................................................................................... 9

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ................................................................................ 9, 10

*Mineworkers Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) .............................................................................. 20, 21

*Morongo Band of Mission Indians v. Rose*,
893 F.2d 1074 (9th Cir. 1990) .................................................................................. 22

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) ................................................................. 12, 13

*Mulligan v. Impax Lab'ys, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ............................................................. 13, 14, 18

iv

*Nathenson v. Zonagen Inc.*,
   267 F.3d 400 (5th Cir. 2001) ........................................................................ 19

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
   739 F.3d 111,1120 (9th Cir. 2013) ................................................................ 21

*Oklahoma Police Pension and Ret. Sys. v. LifeLock, Inc.*,
   780 Fed. App'x 480 (9th Cir. 2019) .............................................................. 16

*Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension
   Plan v. First Solar Inc.*,
   No. 22-CV-36, 2023 WL 4161355 (D. Ariz. June 23, 2023) ...................................... 19

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ...................................................................... 19

*Rehm v. Eagle Fin. Corp.*,
   954 F. Supp. 1246 (N.D. Ill. 1997) ................................................................ 18

*Resnick v. Hayes*,
   213 F.3d 443 (9th Cir. 2000) ......................................................................... 8

*Robb v. Fitbit Inc.*,
   No. 16-CV-00151, 2017 WL 219673 (N.D. Cal. Jan. 19, 2017)................................ 16

*Roberti v. OSI Sys., Inc.*,
   No. CV 13-9174, 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)................................ 17

*Ross v. Career Educ. Corp.*,
   No. 12 C2 76, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)...................................... 17

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ......................................................................... 9

*South Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ....................................................................... 18

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
   551 U.S. 308 (2007)................................................................................... 15

*Westley v. Oclaro, Inc.*,
   897 F. Supp. 2d 902 (N.D. Cal. 2012) ........................................................ 12, 13

*Weston v. DocuSign, Inc.*,
   669 F. Supp. 3d 849 (N.D. Cal. 2023) .......................................................... 15

v

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ........................................................................................ 15

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 9(b) ....................................................................................................... 8, 20
    Rule 12(b)(6).......................................................................................................... 8
    Rule 15(a)............................................................................................................. 22

15 U.S.C.
    §78u-4(b)(1)(B)...................................................................................................... 8

vi

**PRELIMINARY STATEMENT**

Edgio provides content delivery network ("CDN") and other services via its private network. ¶¶2, 21.[1] At the start of the Class Period, most of its revenue came from the sale of CDN-related services to a relatively small number of customers that delivered streamed content. ¶3. Although streaming exploded during the COVID-19 pandemic, by the second half of 2020, Edgio's revenues and profitability were falling. ¶3. Defendant Robert Lyons ("Lyons") was hired to effectuate a turnaround, and on February 11, 2021, he unveiled a three-pronged strategy for returning Edgio to growth and improving profitability called "Improve-Expand-Extend" (the "IEE Strategy"). *Id*. Extending Edgio's core business beyond digital content delivery to include high-margin, high-growth edge and security solutions that could be sold to a larger, more diverse customer base as well as existing CDN customers was the core of the IEE Strategy's plan to drive growth. *Id*.

Edgio accomplished a critical first step in extending its core business in September 2021 when it acquired Moov Corporation dba Layer0 ("Layer0") and its flagship application operations ("AppOps") solution, a "serverless" platform providing development, deployment and monitoring tools designed to deliver sub-second web apps and APIs. ¶¶4, 23. According to Lyons, the combination of Edgio's CDN network and Layer0's purported "best-in-class" AppOps product addressed the needs of an estimated $37 billion market. ECF No. 37-3 at 268. Thereafter, Edgio reported strong financial results and pipeline growth and positive business momentum that Defendants attributed to their successful execution of the IEE Strategy, including the hiring of a "top" caliber, highly trained sales force. ¶¶81-83, 91-93, 98-104. Then, in March 2022, with its stock price rising on this wave of positive news, Edgio announced that it had agreed to acquire Edgecast, a business unit of Yahoo, Inc. and a leading provider of edge security, content delivery and video services. ¶¶4, 100. Although Defendants hailed the transaction as another significant step forward in extending Edgio's core business beyond CDN services,

_____

[1] "¶--" denotes citations to the Amended Complaint for Violation of the Federal Securities Laws (the "AC"), ECF No. 32.

1

a series of announcements between April 28, 2022 and March 13, 2023, gradually revealed the truth:  Edgio's growth was far below the level that the pipeline build Defendants had been touting for nearly a year would have supported.  ¶¶129-31.  Moreover, Edgio's reported revenue in its previously issued financial statements for FY 2021 and 2020, as well as the Quarterly Reports for 2022 and 2021 was materially overstated.  ¶131.  In response to the disclosures, Edgio's stock price declined, causing investors massive losses.

While investors were in the dark prior to these announcements, as the AC makes clear, Defendants knew all along that Edgio's touted IEE Strategy was not positioning the Company for sustainable growth and renewed profitability, and that their statements regarding Edgio's sales, sales force, pipeline and financial results were materially false and misleading.  Because the AC adequately alleges falsity, scienter, and loss causation, Defendants' motion to dismiss must be denied in its entirety.

**THE UNDISCLOSED, MATERIALLY ADVERSE FACTS CONCERNING EDGIO'S PIPELINE, SALES, SALES FORCE, AND REVENUE**

**Edgio's Pipeline Was Inflated During the Class Period.**  During the Class Period, Edgio's sales organization included, among others, Sales Development Representatives ("SDRs") and Account Executives ("AEs"), who were divided among three geographic regions – West, Central, and East.  ¶¶37, 45, 52.[2]  SDRs performed the initial outreach and attempted to induce prospective customers to meet with an AE, who was responsible for making the actual sale.  ¶37.  A prospective customer who agreed to a meeting would be entered into Edgio's customer relationship management ("CRM") system (Salesforce), which was used to track sales "opportunities."  *Id*.  If, after the initial meeting, the AE determined there was an intention on the part of the customer to buy Edgio's products or services, the "opportunity" would be "qualified" in the system.  *Id*.

Although Defendants described Edgio's pipeline of sales opportunities as strong and growing throughout the Class Period, Confidential Witnesses ("CWs") who worked

---

[2]    The sales organization also included solution delivery engineers to provide product support and customizations as needed on an account.  ¶45.

throughout Edgio's sales organization in all geographic areas – SDRs, AEs, and their supervisors – uniformly reported that interest in the new high-growth, high-margin edge computing and security products that were supposed to drive Edgio's growth was virtually non-existent from both "new logos" and existing customers.  ¶¶37, 41, 46-47, 51, 53, 56, 59-60.  Indeed, multiple CWs reported that Edgio had to resort to inducements such as free AirPods and other incentives simply to entice targets to attend an introductory meeting with an AE, and related that when these incentives were discontinued for a time, meetings virtually evaporated.  ¶¶37-38, 47, 54, 56.  Moreover, even when introductory meetings were arranged, few progressed to actual sales. ¶56.

Nearly devoid of actual "opportunities" and under pressure to show results, CWs who worked as AEs stated that they were instructed by superiors, including Edgio's Vice President of Sales, Joe Krasko, to enter potential customers as "opportunities" in Salesforce that did not qualify as such and were not expected to result in sales or risk being placed on a performance improvement plan ("PIP") or worse, losing their jobs.  ¶¶35-36, 40-42, 48, 51.  As a result, "everything went into Salesforce" causing the pipeline numbers to be inflated. ¶51.  Edgio's sales force believed that this "pipeline stuffing" occurred to mislead the market to believe that the Company had a strong pipeline of business.  ¶36.

**Edgio's Newly Hired Sales Force Was Inexperienced, Untrained, and Ineffective.**  In addition to the lack of interest on the part of customers, Edgio's sales efforts were also hampered by an inexperienced and untrained sales force.  Although Defendants assured the market that Edgio's "rapidly expanding" sales force was composed of individuals with relevant experience and existing relationships who had undergone thorough training (*see*, *e.g.*, ¶¶78-79), in fact, employees at all levels of the sales organization stated that SDRs and AEs received little to no training and, consequently, had a poor understanding of Edgio's complicated products and solutions which hampered sales efforts.  ¶¶38, 50, 54, 58.  Indeed, CW2, an SDR from April-December 2022, likened the Company's training efforts to "teaching a cat about space travel."  ¶38.

**Demand for and Sales of Edge Computing and Security Products, in Particular Layer0, Were Weak Throughout the Class Period.**  Numerous CWs including Sales Directors and/or AEs for each of Edgio's three geographic regions and its Global Head of Channel Sales reported that sales of Edgio's edge computing and security solutions, especially of Layer0, were weak throughout the Class Period.

For example, CW6, a Solutions Delivery Engineer at Edgio from June 2019-May 2023, who was part of the sales organization, reported that despite efforts to "upsell" Layer0 as a new user interface to existing customers, few sales occurred because it was not compatible with the edge computing products Edgio had been selling these customers previously.  ¶46.  Net new business was also scarce.  CW7, an AE who worked in Edgio's East region from April 2022-January 2023, reported that s/he was the only person on the East region's team of AEs to secure a net new Layer0 customer during CW7's tenure with the Company.  ¶47.  Similarly, CW8, the Director of Enterprise Sales for Edgio's Central region from May-December 2022, reported that the Central region secured "very few customer meetings" and acquired just three net new accounts during CW8's six months with Edgio.  ¶51.  Likewise, CW9, an AE in the West region from February-November 2022 stated that Edgio had little net new business during this period, something s/he raised during weekly sales team calls to review the sales pipeline.  ¶53.  According to CW9, there were months during this period when no significant deals were closed across the entire team.  *Id.*  CW10, an SDR who was part of the demand generation team from February 2022-April 2023, reported that Edgio's failure to hit its sales goals were discussed at quarterly "all hands" meetings led by Defendant Lyons and attended by other C-Suite members.  ¶¶59-60.  According to CW10, sales were so poor that most AEs were on PIPs and were being threatened with layoffs due to the lack of sales.  *Id.*  Indeed, CW3, who joined Edgio from Layer0 and worked as an AE from June 2021-January 2022, voluntarily left the Company in January 2022 because the pipeline was not sufficient to support CW3's sales activity.  ¶39.

Efforts to sell Layer0 through the Verizon "channel" also fell flat.[3]  With the exception of one repeat customer, CW4, Edgio's Global Head of Channel Sales from June 2022-June 2023, was not aware of any significant Layer0 sales to Verizon channel customers during this period notwithstanding management's focus on driving sales of the product to these customers following the Edgecast acquisition.  ¶¶40-41.  According to CW5, Edgio's Global Verizon Sales Manager from June 2022-June 2023, only a few small deals were completed, and the channel sales team hit its monthly quota just once.  ¶44.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

In stark contrast to the CW accounts, throughout the Class Period, Defendants portrayed Edgio as being in the midst of a successful turnaround.  Defendants lauded the desirability of and demand for Edgio's new security and edge solutions, especially Layer0, its purportedly experienced, well-trained, and effective sales force, Edgio's supposedly "strong" and growing pipeline and positive business momentum, and the Company's "record" financial results.  *See* ¶¶77-79, 81-86, 91-93, 98-104, 109-13, 118-19, 123-26.

For example, in a conference call with analysts on August 24, 2021, Defendants claimed that Edgio had experienced "150% growth in [its] sales pipeline" since the IEE Strategy was unveiled in February and stated that the Company's sales force had been tasked with doubling the pipeline by the end of the year.  ¶78.  Defendants also touted the "upside opportunities" of Layer0, which Defendants maintained increased the Company's total addressable market "for the first time . . . to hundreds of thousands of global enterprises."  *Id*.  Defendants stated that Edgio planned to triple its sales staff over the next three quarters and expected to grow "new logos in [application orchestration] by over 10% in 2022."  *Id*.  Defendants emphasized that Edgio had detailed plans to hire sales staff that had existing relationships and experience in the CDN space that included "better training" with "better content" that would get these new hires up to speed more rapidly.  ¶79.

---

[3]  Edgio's channel team worked with Verizon to sell CDN and web security products acquired in the Edgecast transaction through Verizon's product catalog.  ¶40.

On November 4, 2021, Edgio reported "significant revenue, gross margin and adjusted EBITDA growth quarter-over-quarter" and "[s]trong pipeline growth with new logo bookings up more than 3x quarter over quarter" in Q3 2021.  ¶¶81-82.  During a call with securities analysts the same day, Lyons stated that Defendants were expecting "upsell" of Edgio's new products to existing clients, including Layer0's AppOps solution, "to be fairly quick in terms of its success" and that "client conversations [and] pipeline growth . . . support[ed] that thesis."  ¶83.  Lyons stated that Edgio had been able to "take [the Layer0] product, which was very hot and desirable, and run with it."  ¶85.  Further, Lyons stated that Edgio had done a lot of work to "build the pipeline and create leads and demand gen[eration]."  *Id.*  As a result, Lyons indicated that Edgio's "pipeline was growing pretty rapidly" and at the expected rate and that the Company had ramped its hiring of quality salespeople "to take advantage."  *Id.*

Similar misstatements accompanied Edgio's Q4 2021 earnings release on January 20, 2022.  The release reported "significant" quarter-over-quarter revenue, gross margin and adjusted EBITDA growth and a growing and diverse pipeline for Layer0, which Lyons described as "leading indicators" of "the momentum of the business."  ¶¶91-93.  In addition, Lyons touted "the caliber of new salespeople [Edgio had] been able to attract in the last few months," citing this "ability to attract top talent" as permitting the Company to "accelerate the expansion of [its] commercial growth capacity."  ¶93.

Defendants' statements on April 28, 2022 announcing Edgio's Q1 2022 results continued in this vein touting "significant" year-over-year revenue growth, positive momentum in Edgio's AppOps solutions "resulting in customer additions [that] were the highest they ha[d] been in the previous five quarters," and "growth of more than 30% in Edgio's pipeline from the beginning of the year, with the Layer0 pipeline growing by triple digits."  ¶98.  Defendants also highlighted the "mostly completed . . . planned rebuild of [Edgio's] sales and marketing teams" and stated this was expected "to drive momentum in the second half of the year," citing the "quicker" "conversion time period" of the Layer0

pipeline due to developer interest in "working with [Layer0] as quickly as possible given the productivity and efficiency improvement that [the] product ha[d]."  ¶¶98, 104.

Defendants continued to laud the success of the IEE Strategy and Edgio's business momentum in announcing Q2 2022 results on August 8, 2022, stating that Edgio's new solutions were "demonstrating proof of value" leading its existing clients to "do[] more with" the Company.  ¶109.  Lyons stated that the AppOps pipeline was "up triple digits," "bookings" slightly beat plan, were "ramping to do the same thing [in Q3 2022]," and were "tracking where [Edgio] expected [them] to track."  ¶112.  As a result, Lyons declared that Edgio was "well positioned for continued growth through [2022] and into [2023]," and Defendant Daniel Boncel ("Boncel"), Edgio's CFO, stated that "[b]eyond 2023, [Edgio] continue[d] to have confidence in [its] ability to achieve [its] longer-term objective of double-digit revenue growth, 60% gross margins and 15% adjusted EBITDA."  ¶¶112-13.

Finally, on November 9, 2022, Edgio's Q3 2022 earnings release emphasized that Edgio's "pipeline ha[d] grown high double digits from the beginning of the year, and even more robustly for [its] strategic, high-growth revenue applications solutions," claimed that "[b]ookings of [Edgio's] Applications solutions [in Q3] were [the Company's] highest to date," and stated that "momentum [was expected] to continue into the fourth quarter."  ¶118.  In a subsequent call with analysts, Lyons stated that Edgio was "seeing the traction on sales and bookings that [it] expected to see" and that bookings and sales were tracking as "expected."  ¶124.  In addition, Defendant Stephen Cumming, who had replaced Boncel as CFO, reiterated that Edgio's "pipeline continue[d] to be very strong, driving momentum into the fourth quarter" and declared that "[t]he fundamentals of [the] business [were] strong" and Defendants "remain[ed] bullish on Edgio's transformation story and in [their] ability to drive long-term value creation for [Edgio's] shareholders."  ¶125.

In fact, however, as the CW accounts demonstrate, Edgio's pivot from CDN to a provider of high-growth, high-margin security and edge solutions was failing.  The edge computing and security solutions Defendants claimed were in high demand were not gaining traction with existing or prospective customers, Edgio's sales force was ill-

7

equipped to sell them, and its pipeline was artificially inflated with "opportunities" that no one expected would be converted into sales.

At the same time Edgio was issuing the foregoing materially false and misleading statements, it was also reporting financial results that materially overstated its revenues for FY 2020 and 2021 and each of the first three quarters of 2021 and 2022 by millions of dollars in violation of Generally Accepted Accounting Principles ("GAAP"). ¶¶25-30, 62-63, 67-68, 72-73, 81, 86-87, 91, 94, 98, 106, 109, 114, 118, 120. Further, Edgio later admitted that its internal controls over financial reporting "("ICFR") during the same period were "not effective because of material weaknesses," in contrast with Defendants' repeated statements to the contrary, including in their Sarbanes-Oxley ("SOX") certifications. ¶¶31, 64-65, 69-70, 74-75, 88-89, 95-96, 106-07, 115-16, 121-22.

## ARGUMENT

## I.     APPLICABLE LEGAL STANDARD

A complaint will survive a motion to dismiss when it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 663. When considering a Rule 12(b)(6) motion to dismiss, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000). In addition, a securities fraud complaint must meet the heightened pleading requirements imposed by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Similarly, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B).

## II.    THE AC ADEQUATELY ALLEGES FALSITY

A statement is false or misleading if it "directly contradict[s] what the defendant knew at that time" or "omits material information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018).  When defendants "tout positive information to the market," they must "'do so in a manner that wouldn't mislead investors', including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016).[4]  In determining whether a statement is misleading, the court applies the objective standard of a "reasonable investor." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021).

### A.    The AC Plausibly Alleges Falsity[5]

**Revenue and Internal Control Misstatements.**  Defendants have admitted that Edgio's reported revenue during the Class Period was materially misstated in violation of GAAP and eventually restated and that its ICFR were inadequate.[6]  ¶¶25-31.  Courts have held that in these circumstances falsity and materiality are adequately alleged. *See, e.g.*, *In re Miller Energy Res. Sec. Litig.*, No. 3:11-CV-386, 2014 WL 415730, at \*16 (E.D. Tenn. Feb. 4, 2014) (finding sufficient particularity where "complaint allege[d] that defendants' assurances concerning its internal controls were false because of various known weaknesses and that defendants had to restate their financial statements due in part to inadequate internal controls"); *cf. In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D.

---

[4]    Unless otherwise noted, citations are omitted and emphasis is added.

[5]    In support of their motion, Defendants have submitted Appendix A, which purports to state why the statements identified in the AC are not actionable.  However, Appendix A contains nothing more than conclusory assertions.  In addition, in assessing falsity, statements cannot be viewed "in complete isolation" but must instead be "read in light of all the information then available to the market' to decide if they 'conveyed a false or misleading impression." *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991). Statements "literally true on their face may nonetheless be misleading when considered in context." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Circumstance, setting, and even "manner of presentation" all matter. *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

[6]    For the same reason that Edgio's reported revenue was false, the guidance that Defendants provided investors based on existing revenue data was false, and misleading to the extent it understated the problems with sales that Edgio was facing.

9

Cal. 2001) ("[T]he existence of restated financial results is sufficient to support plaintiffs' belief that the statements were misstated.").

The cases cited by Defendants in support of their arguments are inapposite. *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169 (S.D. Cal. 2009), and *In re Invision Techs., Inc. Sec. Litig.*, No. C04-03181, 2006 WL 538752, at \*6 (N.D. Cal. Jan. 24, 2006), are distinguishable because the SOX certifications made no representations about the specific control deficiencies alleged by the plaintiffs.  In contrast, here, the SOX certifications related to, *inter alia*, the adequacy of Edgio's financial reporting controls, Defendants subsequently admitted that those controls were ineffective, and they further admitted that it was those deficiencies that contributed to the need for a restatement, and, therefore, the falsity of the SOX certifications is established.

**Sales and Pipeline Misstatements.**  Although Defendants' App'x A asserts that the alleged misstatements related to Edgio's sales, sales force, and sales pipeline were not false and misleading, it offers no explanation for this assertion.  Their brief addresses the topic in a single paragraph, which cites *one* example of a statement (sans context) that they take issue with,[7] ignoring that Plaintiff has alleged *multiple* statements that were false or misleading with respect to Defendants' sales pipeline, growth and strategy.  For example: (i) on August 24, 2021, Defendant Lyons told investors that Edgio had already experienced a "*150%* growth in [its] pipeline in the last 6 months" (¶77); (ii) on November 4, 2021, Edgio reported, and Lyons repeated on the earnings call, "[s]trong pipeline growth with new logo bookings *up more than 3x* quarter over quarter" (¶¶81, 82), and in response to an analyst question, Boncel affirmed that Edgio's success "in terms of new pipeline" was driven by Layer0 (¶85); (iii) on April 28, 2022, Edgio announced, and Lyons repeated on the earnings call, that "[t]otal company pipeline ha[d] *grown more than 30%* from the beginning of the year, with Layer0 pipeline *growing by triple digits*" (¶¶99, 101); (iv) on

---

[7]    Contrary to what Defendants suggest, their selected statement (that Edgio had its "first-ever eight figure TCV [total contract value] win," Defs. Mot. at 19), can be both true and misleading to the extent it creates a false impression of Edgio's success in selling its products. *Miller*, 519 F.3d at 886.

August 8, 2022, Lyons stated that Edgio's pipeline "[was] already up *50%* th[at] year" (¶112); and (v) on November 9, 2022, Edgio reported that its "[s]ales pipeline *grew 75%* from the beginning of the year" (¶118).

Plaintiff has adequately alleged that these and similar statements were false and misleading. Specifically, the statements regarding the health of Edgio's sales pipeline, the quality of its sales force and customers' interest in Edgio's products (particularly Layer0) were false and misleading because they omitted key facts – namely, that Edgio's sales pipeline was inflated with opportunities that had little chance of becoming sales (*e.g.*, ¶¶35-37, 39, 46, 48, 51, 54, 56, 60); Edgio's SDRs were not effectively trained on, and did not understand how to properly sell, Edgio's highly complex products, which further contributed to low sales (*e.g.*, ¶¶35, 38, 44, 50, 54, 58); and Layer0, which required substantial commitments from new customers to implement, was garnering little or no customer interest, further exacerbating low sales since Layer0 was the focus of Edgio's sales efforts during the relevant time period (*e.g.*, ¶¶39, 41-42, 46-47, 51, 53, 57). Defendants have no rebuttal to these allegations.

**B.    The PSLRA's Safe Harbor for Forward-Looking Statements Does Not Apply to Mixed Statements**

The Ninth Circuit has recognized that "where defendants make mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of the PSLRA." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). The vast majority of statements that Defendants claim as forward-looking are – at best – mixed statements. For example, the statement that Edgio's "existing hundreds of customers . . . deployed for content delivery" were "low-hanging fruit for application orchestration" that were "ripe for [sales]" (Defs. Mot. at 14),[8] was a false and misleading *present statement* – mixed with a

---

[8]    Defendants ask the Court to incorporate a number of documents by reference (Defs. Mot. at 4 n.2) and Plaintiff does not oppose this request. However, contrary to Defendants' contention, their contents should not be automatically taken as true: "it is improper to

forward-looking statement about new logo growth in the coming year. *See* ¶78. Multiple CWs related that Edgio's existing customers had little, if any, interest in these new products. ¶¶41, 46.

Defendants also (and improperly) try to categorize statements of existing fact – for example, statements about "how [Edgio's] expectations arose from 'the leading indicators that the Company was seeing with client conversations and pipeline,'" Defs. Mot. at 14 – as forward-looking on the grounds that they are "assumptions underlying or related to" future projections that would be protected by the PSLRA's safe harbor. However, "a past or present *fact* can[not] be deemed an assumption. Only assumptions underlying a prediction about the future are protected by the safe harbor provision." *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 918 (N.D. Cal. 2012), *on reconsideration in part* (Jan. 10, 2013) (emphasis in original); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir. 1999) ("Observed facts [about, *e.g.*, depressed customer orders] are not 'assumptions,' and they are not any kind of prediction, either, that would put them within the definition of a forward looking statement."). Moreover, revenue and growth predictions accompanied by and premised on alleged false representations about Edgio's current pipeline are not protected by the safe harbor. *See Quality Sys.*, 865 F.3d at 1148 (revenue projections premised on current state of sales pipeline not forward-looking); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1021 (N.D. Cal. 2020) (PSLRA safe harbor does not apply to "financial forecasts intertwined . . . with . . . misstatements of current revenues and . . . revenue pipeline.").

**Safe Harbor.** To the extent any of Defendants' statements can be considered forward-looking, Defendants either knew they were false and misleading when made or the misleading statements were not accompanied by meaningful cautionary language. On the latter point, Defendants argue that "every [potential forward-looking] statement Plaintiff alleges is misleading or false was accompanied by substantial cautionary language," pointing to warnings of risks in "reduction of demand," "changes in our hiring

---

assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003.

12

patterns," and generally directing the Court to risk factors enumerated in Edgio's SEC filings (without bothering to identify which they believe are relevant). Defs. Mot. at 15. But none of Defendants' identified "risk factors" warn that (i) Edgio's financial statements were misstated, (ii) its internal controls were inadequate, (iii) its sales pipeline was inflated, (iv) its sales force was inexperienced and untrained, or (v) there was little, if any, demand for its Layer0 product. Moreover, "[w]here, as here, forward-looking statements are accompanied by non-forward-looking statements about current or past facts, that the non-forward-looking statements are, or may be, untrue is clearly an 'important factor' of which investors should be made aware[,]" and "it is likely that no cautionary language – short of an outright admission of the false or misleading nature of the non-forward-looking statement – would be 'sufficiently meaningful' to qualify the statement for the safe harbor." *Quality Sys.*, 865 F.3d at 1146-47; *see Mulderrig*, 492 F. Supp. 3d at 1022 (same). As a result, and because any questions about the sufficiency of any cautionary language must be resolved in Plaintiff's favor,[9] the safe harbor does not defeat Plaintiff's claims.

In addition, as explained *infra*, viewed holistically, the allegations of the AC give rise to a strong inference that Defendants knew, or were reckless in not knowing, that demand for Edgio's edge and security solutions, including Layer0, was weak, the sales force was not as represented, and the pipeline was inflated with opportunities that were not expected to ripen into sales. As a result, statements such as Lyons' on November 4, 2021, that Edgio was expecting "upsell" of these new products "to be fairly quick in terms of its success" based on client conversations and pipeline growth (Defs. Mot. at 13), are not entitled to the protection of the PSLRA safe harbor.

**Puffery.** "Puffing" statements "are generally 'not capable of objective verification', and [they] 'lack a standard against which a reasonable investor could expect them to be pegged.'" *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). "A

---

[9]     *See Westley*, 897 F. Supp. 2d at 920 ("Under Ninth Circuit law, if there is a legitimate factual dispute as to whether that cautionary language is sufficient, then dismissal is not warranted.") (collecting cases).

13

court may grant a motion to dismiss on the basis that offered 'statements are puffery only if it concludes that the statement is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.'" *In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149, 1154 (C.D. Cal. 2022), *reconsideration denied sub nom.,* 2022 WL 18584804 (C.D. Cal. Aug. 25, 2022) (quoting *Mulligan*, 36 F. Supp. 3d at 966).  Defendants do not meet this high burden.  Statements about, *e.g.*, whether the launch of Layer0 was a "success," new client wins were "diverse," the caliber and abilities of Edgio's sales force, and the opportunity presented by Edgio's Open Edge strategy (*see* Defs. Mot. at 16-17, citing ¶¶78, 81, 93) are both capable of objective verification and would be meaningful to investors, especially in light of the misstatements discussed herein regarding these exact subjects.  Likewise, statements about "traction" and business "momentum" are actionable when, as here, they are tethered to specific financial metrics or facets of a company's business.  *See In re Green Dot Corp.*, No. CV 19-10701, 2024 WL 1356253, at *4-5 (C.D. Cal. Mar. 29, 2024) (statement that Green Dot "continues to gain traction on nearly all fronts" not puffery); *Barry v. Colony NorthStar, Inc.*, No. CV 18-2888, 2020 WL 13834796, at *17 (C.D. Cal. Feb. 20, 2020) (statement that "the tide appears to have turned for both institutional and retail placements based upon the momentum we're now experiencing in both markets" not puffery "[i]f, in fact, there was no momentum in those two markets (or the momentum was negative).").  Thus, for example, the statements that Edgio's AppOps business had "positive momentum" as evidenced by "[c]ustomer additions [that] were the highest they had been in the previous five quarters" (¶98), that Edgio was "actually seeing the traction on sales and bookings that [it] expected to see" (¶124), and similar statements are actionable.[10]

## III.    PLAINTIFF ALLEGES A STRONG INFERENCE OF SCIENTER

Under the PSLRA, plaintiffs must allege facts supporting a "strong inference" of

---

[10]    Although not addressed in their brief, Defs. App'x A appears to suggest that the statements regarding Edgio's pipeline were puffery.  However, the Ninth Circuit has found similar statements material and actionable.  *See Quality Sys.,* 865 F.3d at 1142-44.

14

defendants' scienter (*i.e.*, intentional or reckless misconduct). This inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most plausible of competing inferences," but need only be "as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 324 (2007). The inquiry is whether, "[w]hen the allegations *are accepted as true and taken collectively*, would a reasonable person deem the inference of scienter *at least as strong* as any opposing inference?" *Id*. at 326. In making this determination, a court must draw all reasonable inferences in plaintiff's favor, *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016), and consider all of plaintiff's allegations "holistically." *Alphabet*, 1 F.4th at 701; *see also Quality Sys.*, 865 F.3d at 1145 (holding that, "taken collectively," confidential witness statements gave rise to strong inference of scienter). Here, when viewed holistically, the allegations of the AC give rise to a strong inference of scienter.

### A.    The CW Allegations Support a Strong Inference of Scienter

As shown above, the CW accounts demonstrate that Defendants intentionally or recklessly inflated Edgio's reported pipeline and exaggerated demand for and interest in Edgio's new edge computing and security products to mislead investors regarding the success of the Company's IEE Strategy. That inference is only bolstered by the fact that Defendants have not offered *any* competing, non-culpable inference that could be drawn from the CWs' accounts. *See* Defs. Mot. at 7-12. Nor could they.

Contrary to Defendants' contention, there can be no serious dispute that the CW allegations satisfy the two "hurdles" set forth in the Ninth Circuit's decision in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Indeed, Defendants concede that the AC "describe[s] the [CWs] 'with sufficient particularity to establish their reliability and personal knowledge,'" (*id*.),[11] and argue only that none of the CW

---

[11] The AC "describe[es] [each CW's] role within [Edgio], how long they were employed there, the nature of their responsibilities, . . . their exact titles and who they reported to," thereby establishing their reliability and personal knowledge. *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 882 (N.D. Cal. 2023). Further, "[t]he number of [CWs], their overlapping job responsibilities, and their corroborating allegations also support their reliability and personal knowledge of what is alleged." *Id*.

allegations "shed light on the state of mind of any Individual Defendant." Defs. Mot. at 9. Defendants' contention that the CW allegations are inadequate in this regard because the CWs did not "report to the Individual Defendants" or "speak to . . . [them] . . . regarding . . . the topics of the alleged misstatements" (Defs. Mot. at 9-10) has been repeatedly rejected. *See*, *e.g.*, *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1060 (C.D. Cal. 2008) (holding that evidence that CWs had spoken to, had contact with or had personal knowledge relating to defendants was "not necessary"); *Robb v. Fitbit Inc.*, No. 16-CV-00151, 2017 WL 219673, at *6 (N.D. Cal. Jan. 19, 2017) ("That plaintiffs' allegations do not directly connect the dots between [a non-defendant C-suite executive's] knowledge and the individual defendants will ***not*** be grounds for dismissing the complaint.").[12]

Indeed, any suggestion that Defendants were somehow unaware that Layer0 sales were weak and the pipeline was inflated falls flat for several reasons. First, Defendants' own public statements admit that they tracked the relevant information. For example, in the August 2021 call with analysts held to explain and persuade the market of the viability of the IEE turnaround strategy, Lyons described Edgio as "an execution-focused company" and stated that each week Edgio's leadership reviewed 24 key performance indicators ("KPIs") critical to the performance of the Company and that a similar review was conducted with all employees once each month. *See* ECF No. 37-3, Ex. C at 9. As further evidence of management's "maniacal[] focus[]" on Edgio's performance, Lyons also disclosed that Edgio had implemented a process called "4P90" focused on KPI performance, planning, progress and problems. *Id*. According to Lyons, every Edgio employee, including himself, had an individual 4P90 of KPIs they were accountable for

---

[12]    *In re Extreme Networks, Inc. Sec. Litig.*, No. 15-CV-04883, 2018 WL 1411129, at *25 (N.D. Cal. Mar. 21, 2018), does not hold that direct contact between the CWs and Individual Defendants is required. In *Bajjuri v. Raytheon Techs. Corp.*, 641 F. Supp. 3d 735 (D. Ariz. 2022), the misconduct involved only a few contracts making the competing, benign inference more plausible. *Id*. at 760-61. Finally, the plaintiff in *Avila v. LifeLock, Inc.*, No. 15-CV-1398, 2016 WL 4157358 (D. Ariz. Aug. 3, 2016), ultimately succeeded in reversing the District Court's dismissal of its claims. *See Oklahoma Police Pension and Ret. Sys. v. LifeLock, Inc.*, 780 Fed. App'x 480, 485 (9th Cir. 2019).

16

that Lyons "review[ed] with the team once a month with the whole company" to determine what "need[ed] to [be] adjust[ed] for the next 90 days" and how to "drive those KPIs." *Id*. In addition, in a later call with analysts, Lyons stated that Edgio had "a bookings target that [it] ha[d] to hit every month, every quarter" that was "track[ed] . . . every week throughout the year." ¶104. The Ninth Circuit has held that statements such as these demonstrating Defendants' close monitoring of performance data support a strong inference of scienter. *See E. Ohman J:Or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 940 (9th Cir. 2023).[13]

Second, the AC includes multiple statements by CWs indicating that Defendants and other members of Edgio's senior leadership had access to information at odds with the alleged misstatements including (i) CW4's statement that s/he "tried to explain to Edgio CTO Ajay Kapur, the founder and former CEO of Layer0, that it was not possible to sell Layer0 through the Verizon channel" but was nonetheless "instructed to add Layer0 as a 'hidden product' when pricing deals, creating 'a pipeline out of nowhere;'" (¶42); (ii) CW8's statement that the Individual Defendants had access to information about the sales pipeline and that s/he believed they "'100%' looked at the data from Salesforce" (¶51); (iii) CW9's statement that s/he "raised the challenges of selling [Edgio's] products during the sales team's weekly calls each Monday to review the sales pipeline," which were attended by the Director, Enterprise Sales as well as the VP of Sales (¶53); (iv) CW10's statement that "weekly reports on 'demand generation'" showing few leads and "zero" qualified opportunities were pulled from Salesforce and "reviewed during team meetings" attended by Debbie Richman, Edgio's VP, Global Demand Generation (¶60); and (v) CW10's statement that "[a]t quarterly 'all-hands' meetings . . . there were discussions about [Edgio] not hitting its sales numbers" (*id*.). Such allegations support a strong inference of scienter as the more pervasive the fraud is, the less plausible are defendants' denials that they were somehow "alone" in being unaware of it. *See Ross v. Career Educ. Corp.*, No. 12 C2 76,

---

[13]    Moreover, "an inference of scienter can be established by the fact that the Defendants touched on the specific issues of [Edgio's pipeline and the demand for and sales of Layer0] in their public statements*." Roberti v. OSI Sys., Inc.*, No. CV 13-9174, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015).

17

2012 WL 5363431, at *9 (N.D. Ill. Oct. 30, 2012) (where CWs "detailed facts supporting claim that defendants' practice of improperly inflating job placement statistics was both widespread and pervasive," such allegations support strong inference of scienter); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("The more serious the error, the less believable are defendants' protests that they were completely unaware . . . and the stronger is the inference that defendants must have known."). Moreover, here, multiple CWs stated that salespeople were instructed and/or pressured to inflate opportunities in Salesforce (¶¶36, 48, 51), and were threatened with probation or termination if they refused to do so (¶¶48, 51). Such particularized facts also support a strong inference of scienter. *See*, *e.g.*, *In re XL Fleet Corp. Sec. Litig.*, No. 21 Civ. 2002, 2022 WL 493629, at *6 (S.D.N.Y. Feb. 17, 2022) (that the company's VP of sales "pressured employees to inflate sale probabilities" constituted "strong circumstantial evidence of conscious misbehavior or recklessness" and "ma[d]e the inference [of scienter] more compelling than an inference that [d]efendants acted non-culpably.").

**B.     The Core Operations Doctrine Supports a Strong Inference of Scienter**

The core operations doctrine – the theory that "facts critical to a business's 'core operations' . . . are known to a company's key officers . . . can be one relevant part of a complaint that raises a strong inference of scienter." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Edgio's pivot to becoming a higher growth edge computing company was at the center of Lyons' turnaround strategy and sales of Layer0 were a key metric of that success. However, instead of avid interest, Layer0 was met with indifference, severely damaging Edgio's prospects. These issues were so fundamental to Edgio that "it would be difficult to conclude . . . Defendants at the top levels of . . . management did not know what was going on." *Countrywide*, 554 F. Supp. 2d at 1066; *see also Mulligan*, 36 F. Supp. 3d at 969-70 (Importance of manufacturing and quality control to success of pharmaceutical company led to "a logical, and strong, inference" that defendants were aware of problems at company's facilities.). This is especially true here where Defendants told investors that they were closely monitoring the relevant data. *See*

18

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (core operations can support inference of scienter where there are "specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring.").[14]

### C.    Misstated Revenue and False SOX Certifications

Edgio's admission that it misstated its revenues and related metrics for FY 2020 and 2021 and the first, second, and third quarters of 2021 and 2022 and its confirmation that there were material weaknesses in its ICFR "support at least some degree of scienter." *In re Mattel, Inc. Sec. Litig.,* No. 2:19-CV-10860, 2021 WL 1259405, at *7 (C.D. Cal. Jan. 26, 2021).[15]   For example, in *Batwin v. Occam Networks, Inc.*, No. CV 07-2750, 2008 WL 2676364 (C.D. Cal. July 1, 2008), the court held that allegations of GAAP violations that reduced the company's revenue by 4% ($32.9 million) over a three-year period gave rise to a strong inference of scienter even though the revenue would have been recorded later. *Id*., at *13.   Here, as in *Batwin*, Defendants admitted GAAP violations resulting in a 6% overstatement of Edgio's revenue ($46 million) over less than three years likewise support a strong inference of scienter.  ¶28.  Moreover, this inference is not undermined in any way by Defendants' improper factual arguments regarding the restatement, including that Edgio's financial statements were "audited by Ernst & Young LLP, a Big Four independent auditor" (Defs. Mot. at 1).  *See In re Diamond Foods, Inc. Sec. Litig.*, No. C11-05386, 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012) (Clean audit opinion from Deloitte did not undermine inference of scienter as "[s]enior management . . . had an independent duty to

---

[14]    In both *Intuitive* and *Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v. First Solar Inc.*, No. 22-CV-36, 2023 WL 4161355, at *5 (D. Ariz. June 23, 2023), cited by Defendants, such admissions were lacking.

[15]    Defendants' cases are inapposite. *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 746 (9th Cir. 2008), "involved a ***discrete set*** of illegal payments made by [the company's] foreign sales agents operating [outside the United States]." *Anderson v. Spirit Aerosystems Holdings, Inc.,* 827 F.3d 1229, 1245-46 (10th Cir. 2016), lacked "detailed allegations about the defendants' actual exposure to [the] information [at issue]." *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 424-25 (5th Cir. 2001), merely holds that an officer's position alone, without more, does not suffice to create an inference of scienter.

ensure compliance with GAAP and maintain effective internal controls.").[16]

## IV.    PLAINTIFF ADEQUATELY ALLEGES LOSS CAUSATION

Pleading loss causation requires allegations of "a causal connection between the material [misstatement or omission] and the loss," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005), which calls for "no more than the familiar test for proximate cause," *Mineworkers Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citing *Dura*, 544 U.S. at 346). Plaintiff shows a "causal connection between the fraud and the loss, by tracing the loss back to the very facts about which the defendant lied." *Id.* Although loss causation must satisfy Rule 9(b)'s heightened pleading requirements, this "usually adds little to the burden." *In re Bofl Holding, Inc. Sec. Litig.,* 977 F.3d 781, 794 (9th Cir. 2020). Plaintiff need only "provide enough factual content to give the defendant 'some indication of the loss and the causal connection that the plaintiff has in mind.'" *Id.* (quoting *Dura Pharmaceuticals,* 544 U.S. at 347). "[E]ven under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant notice of plaintiffs' loss causation theory and provide the court some assurance that the theory has a basis in fact." *Bofl Holding*, 977 F.3d at 794. *See also Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020) (Rule 9(b) "does not require that the causation inference be *more* than "plausible.")[17]

With the correct standard in mind, Defendants' argument that the AC does not plausibly allege that the April 28 and November 9 disclosures corrected past misstatements fails. Based on numerous CW accounts, the AC plausibly alleges that Defendants' Class Period statements misrepresented, *inter alia*, the demand for Layer0 and the strength of the

---

[16]    Defendants' assertion that Edgio's financial statements were audited by E&Y is, at best, imprecise. Edgio's quarterly financial statements were unaudited. More than half of the improper revenue from the Open Edge arrangements was recognized in Q1-Q3 2022.

[17]    This Court has not "rejected" the materialization of the risk theory of loss causation. *Magro v. Freeport-McMoran Inc.*,No. CV-16-00186-PHX-DJH, 2018 WL 3725781, at *9 (D. Ariz. Aug. 3, 2018), held only that the theory had not been adequately alleged. Numerous District Courts in this Circuit have upheld allegations of loss causation based on the materialization of the risk theory. *See*, *e.g. In re WageWorks, Inc., Sec. Litig.*, No. 18-CV-01523, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020).

pipeline, and the disappointing 6% organic growth disclosed on April 28 and the reduced FY2022 revenue guidance announced on November 9 called the veracity of those prior statements into question, causing Edgio's stock price to decline 25.1%. Indeed, the AC alleges that Edgio's April 28 disclosure of organic growth of just 6% year-over-year for Q1 2022 caused Davidson & Co. analyst Rudy Kessinger to warn that the strong "pipeline build" Defendants had been touting for several quarters had "yet to materialize." ¶¶129, 152.

For the same reasons, the AC plausibly alleges that the November 9 announcement, which revealed that Edgio was reducing revenue guidance for FY 2022, also corrected Defendants' prior misstatements. On November 9, 2022, investors learned that Edgio's prior revenue guidance for FY 2022 of $380 to $390 million, which had been predicated on the purportedly strong demand and growing pipeline for Layer0, could not be met, and that FY 2022 revenue was now expected to be in the range of $362 to $367 million, a reduction of $20.5 million at the midpoint, causing Edgio's stock price to decline 35.6%. (¶¶130, 152). Although Edgio's announcement did not explicitly tie this reduction in guidance to disappointing sales of Layer0, a corrective disclosure does not have to disclose the fraud at issue,[18] and the AC plausibly alleges that disappointing sales of Layer0 were at least partially responsible for the reduction in guidance as it alleges that Layer0 was falling well short of its $20 million revenue target in FY2022. ¶131. Nothing more is required to "trace [investors'] losses back to the very facts about which the defendant lied," *Mineworkers*, 881 F.3d at 753, and plead loss causation at this early stage.[19] *See, e.g., In re*

---

[18]    See *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 739 F.3d 111,1120 (9th Cir. 2013) ("Disclosure of the fraud is not a *sin qua non* of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.").

[19]    Defendants' authorities are distinguishable. Loss causation allegations were deemed inadequate in *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 773 (N.D. Cal. 2020) because the complaint offered "little more than conjecture" regarding the cause of the reduction in the company's forecast. In *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022), the announcement of disappointing results of a second drug trial did not suggest that data in an earlier trial had been manipulated.

*Impinj, Inc. Sec. Litig.*, 414 F. Supp.3d 1327, 1337-368 (W.D. Wash. 2019) (allegations that defendants misrepresented the functionality of company's primary product causing demand to decline resulting in drop in revenues which, when disclosed, caused the share price to drop were "steps in [a] causal chain [that were] all plausible and foreseeable"); *Leventhal v. Chegg, Inc.*, No. 21-CV-09953, 2024 WL 924484, at *8 (N.D. Cal. Mar. 4, 2024) (loss causation alleged where analysts noted connection between lowered guidance and the facts defendants allegedly misrepresented). Further, the April 28 and November 9 disclosures "represented the materialization of the risk about which investors had allegedly been misled." *City of Birmingham Relief and Ret. Sys. v. Acadia Pharm., Inc.*, No. 3:21-cv-00762, 2022 WL 4491093, at *14 (N.D. Cal. Sept. 27, 2022).

## V.   LEAVE TO AMEND SHOULD BE GRANTED

Plaintiff respectfully requests leave to amend in the event the Court grants Defendants' motion to dismiss in any respect.   District courts "shall grant leave to amend freely 'when justice so requires.'" *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (*en banc*) (quoting Fed. R. Civ. P. 15(a)).   Courts in the Ninth Circuit are to apply this policy "with extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).   Absent a strong showing of undue delay, bad faith, or dilatory motive, there exists a ***presumption*** under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

### CONCLUSION

Defendants' Motion to Dismiss should be denied in its entirety.

Dated:  April 10, 2024                          **SCOTT+SCOTT**

**ATTORNEYS AT LAW LLP**
 s/ *Deborah Clark-Weintraub*
Deborah Clark-Weintraub (*pro hac vice*)
Thomas L. Laughlin, IV (*pro hac vice*)
Emilie B. Kokmanian (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169

Telephone: 212-233-6444
Facsimile:  212-233-6334
dweintraub@scott-scott.com
tlaughlin@scott-scott.com
ekokmanian@scott-scott.com

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
Garrett W. Wotkyns (AZ Bar No. 025887)
8068 East Del Acero Drive
Scottsdale, AZ 85258
Telephone: 480-889-3514
Facsimile:  212-233-6334
gwotkyns@scott-scott.com

**THE SCHALL LAW FIRM**
Brian J. Schall (*pro hac vice* forthcoming)
Brian R. England (AZ Bar No. 024888)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  310-388-0192
brian@schallfirm.com
BrianE@schallfirm.com

*Co-Lead Counsel for the Class*

23

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2024, I caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Executed on April 10, 2024, at New York, New York.


  s/ *Deborah Clark-Weintraub*
Deborah Clark-Weintraub